**Jehan Abdur RAHEEM, f/k/a John Whitaker, Petitioner–Appellant,**

v.

**Walter R. KELLY, Superintendent of Attica Correctional Facility, Respondent–Appellee.**

**Docket No. 00–2304.**

United States Court of Appeals, Second Circuit.

Argued Jan. 8, 2001.

Decided July 13, 2001.

---

Norman R. Williams II, New York, N.Y. (Mayer, Brown & Platt, New York, NY, on the brief), for Petitioner–Appellant.

Leonard Joblove, Assistant District Attorney, Brooklyn, NY (Charles J. Hynes, District Attorney Kings County, Florence M. Sullivan, Assistant District Attorney, Brooklyn, NY, on the brief), for Respondent–Appellee.

Before: KEARSE, JACOBS, and CABRANES, Circuit Judges.

KEARSE, Circuit Judge:

Petitioner Jehan Abdur Raheem, formerly known as John Whitaker ("Raheem", "Whitaker", or "Whitaker/Raheem"), a New York State ("State") prisoner convicted principally of robbery and murder, appeals from a judgment of the United States District Court for the Eastern District of New York, Edward R. Korman, *Chief Judge,* denying his petition pursuant to 28 U.S.C. § 2254

(1994 & Supp. III 1997) for a writ of habeas corpus vacating his convictions on the ground that he was denied due process at trial by the admission of unreliable identification evidence. The district court denied the petition, ruling that, although the identifications were the product of an impermissibly suggestive procedure, their admission was not erroneous because other evidence, although inadmissible or not introduced at trial, corroborated Raheem's guilt and therefore made the identifications reliable. For the reasons that follow, we reverse.

## I. BACKGROUND

For purposes of this appeal, many of the facts are undisputed. In January 1976, three men robbed a bar; one of them, described principally as wearing a black leather coat, shot one of the owners. After two trials, Raheem was convicted as the shooter. The following description of the events and the police investigation is taken largely from the record of Raheem's second trial and pretrial hearings on motions to suppress.

### A. *The Robbery and Murder*

In the early evening of January 4, 1976, at the Moulin Rouge, a neighborhood bar in Brooklyn, New York, several persons watched a football game on television: the bar's part-owner Charles Hill, the bartender Cecile Dukes, and four patrons, Arthur Shiloh, Vincent Cooke, Winfred Moore, and Sam Hayward. Three strangers entered the bar; one stood near the window at the front; the other two went briefly to the men's room. Upon their return, one approached Hill and engaged him in conversation; the other stood behind Shiloh, Cooke, and Moore, who were chatting while they drank and watched the game.

After about 15 minutes, a shot was heard; Hill fell onto the man who shot him, then onto the floor, dead. The patrons and the bartender had not seen the shooting but turned in time to see Hill fall; Cooke, Moore, Hayward, and Dukes observed a gun in the hand of the stranger standing near Hill. The man standing behind Shiloh, Cooke, and Moore then also brandished a gun and announced a holdup. He proceeded to take money, jewelry, and other items from Shiloh and Cooke; the shooter took such items from Hayward and Moore, including Moore's car keys. The robber who had been standing near the front window vaulted the bar and took money from the cash register. The patrons and the bartender were then herded into the men's room and warned not to come out. The robbers fled in Moore's car.

After a few minutes, the survivors left the bathroom and summoned the police.

### B. *The Investigation and the Identifications*

The police interviewed the witnesses and obtained descriptions of the robbers. The only testimony by a police officer as to the contents of their descriptions of the shooter, given by Detective Anthony Martin at a *Wade* hearing on a motion to suppress identifications of Raheem by Shiloh and Cooke, *see United States v. Wade*, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), was that a police report "state[d] a three quarter length black coat." (*Wade* Hearing Transcript ("*Wade* Tr."), January 10, 1977, at 233.) However, Shiloh and Cooke, at the *Wade* hearing or at trial, testified to the somewhat fuller descriptions they recalled having given.

Shiloh testified that he told a police detective that the shooter "was dressed very neat, brown skin, had a black leather coat and a cap. That's the best description."

(*Wade* Tr. 130.) When the detective asked about height, weight, and age, Shiloh responded that the shooter was about 5'8", 165 or 170 pounds, and perhaps 27–30 years of age. (*See id.*) Shiloh recalled that the shooter did not have a moustache or long sideburns; but he had not noticed anything about the shooter's eyes, other facial features, head shape, or hair length. (*See Wade* Tr. 125–26.)

Cooke testified that the description he had given the police immediately after the shooting was of a man "about five-seven or eight," wearing a "black hat and black leather coat." (*Wade* Tr. 181–82; *see also* Second Trial Transcript ("Second Trial Tr.") 183 (Giving the police "the best [description] that [he] could remember," Cooke had "figured [the shooter] was about five[-]seven. I know he had on a black leather coat and he had on a black cap. That I can remember.").) The shooter was "medium size" and appeared to be in his 20s. (Second Trial Tr. 183–84.) The only facial feature that stood out in Cooke's mind was that the shooter "had weird eyes" (Second Trial Tr. 184), perhaps "a glare or . . . how he fixed his eyes" (*Wade* Tr. 186). As to whether he had described the shooter's eyes to the detective, Cooke stated: "How could you describe his eyes? They were different. That's how I put it, something about it that stood out." (*Id.*) Cooke testified that he did not recall anything physically distinctive about the shooter's mouth or nose; his only description of the shooter's face was that it was round and that his eyes were weird. (*Wade* Tr. 186–88.)

The subsequent investigation by the police took a number of uncommon turns. First, on January 10, six days after the shooting, Cooke and Shiloh were shown a photographic array. They, independently, selected the same photo as the face of the man who, at gunpoint, had taken their cash and jewelry. Further investigation, however, revealed that their identifications could not be correct. At the time of the robbery, the man Cooke and Shiloh chose was in prison.

Next, a police lineup resulted in the identification of a person participating purely by happenstance, rather than the person the police had suspected and placed in the lineup on the basis of confidential information. The police had received a tip from an informant that the person who killed Hill was one Lindsay Webb. Webb was arrested on January 24 and brought to the 77th Precinct, where Detective Martin arranged to hold a lineup. Martin attempted to include in the lineup five police officers who generally matched Webb's appearance. Only three such officers were available, however. In the meantime, Raheem, who was then known as John Whitaker, had been arrested by Detective Clarence Crabb in connection with an unrelated case, the murder of one Harriet Gathers. Whitaker/Raheem was not a suspect in the Hill slaying. He was in custody at the 77th Precinct on January 24 on the *Gathers* case, and when Martin could not get five police officers who resembled Webb, Martin included Whitaker/Raheem and another arrestee in the lineup. Whitaker/Raheem was wearing a black leather coat.

All five of the witnesses to the robbery/murder were asked to view the lineup. Two did not: Moore had an ailing back; Hayward arrived too late. The lineup was viewed by Shiloh, Cooke, and Dukes. Shiloh, upon first viewing the lineup, was unable to identify anyone. Dukes was never able to make an identification. Cooke made an identification; but, to the surprise of the police officers, he identified Whitaker/Raheem, not Webb, as the man who had shot Hill. At the *Wade* hearing, Cooke testified:

Well, I looked them all over carefully because[ ] I didn't want to make any mistakes and then I picked number one, the guy. Mr. Whitaker had a sign in his hand that said one and I picked him. *I said he appeared to be the one that I remember in the bar. And I could tell from his, you know—his coat is another thing. He had on a leather coat that I remembered.*

. . . .

Q. When you identified Mr. Whitaker as one of the people who were in the bar, did you do that solely based upon the fact that he was[ ] wearing a black leather coat?

MR. FEDER: Objection, your Honor. Leading.

THE COURT: Objection sustained.

Q. What was the basis for your picking out Mr. Whitaker?

A. His face.

Q. What were you thinking back to when you made the identification?

A. How he looked like the man that I saw in the bar. And *the clothes. You know, he had on the same clothes.* I looked at the round face.

(*Wade* Tr. 165–66 (emphases added).) Whitaker/Raheem was the only person in the lineup wearing a black leather coat.

Shiloh, after viewing the lineup and failing to identify anyone, had remained in a waiting room near the lineup viewing room. He testified that when Cooke returned from the lineup viewing room, Martin took Dukes to view the lineup, and Shiloh and Cooke chatted in the waiting room. They did not talk about the lineup, but when Martin returned with Dukes, Shiloh asked to view the lineup again and was permitted to do so. This time he promptly identified Whitaker/Raheem. At the *Wade* hearing, he testified:

Q. At that time was there any doubt in your mind when you looked through that window the second time that number one was the man that you saw in the bar, was there any doubt?

A. Everybody have a little doubt, but I said that was the man. O.K.

Q. But you weren't absolutely sure?

A. Not positive, but I said that was the man, really, because you see like at the time he was standing there he didn't have the cap on, ... but face features of him[,] the black leather coat, the same thing, *the black leather coat really set it off for me.*

Q. *That black leather coat was outstanding in your mind?*

A. *Right, because it wasn't no cheap coat.*

Q. *And you remember the black leather coat worn by one of the men in the bar on January 4th?*

A. *Right.*

. . . .

Q. *The fact that John Whitaker was wearing a black leather coat in this lineup and that one of the men in the bar that evening was wearing a black leather coat, you put those two facts together, is that right?*

A. *I am just going by what I saw what he was wearing. That is what I am talking about.*

. . . .

Q. . . . . *Mr. Shiloh, the elements that went through your mind at the time that you asked to make this identification, did you make the identification basically on the facts that the man in the bar on January the 4th was wearing a neat[ ] black leather coat and John Whitaker, number one in the lineup, was wearing a black leather coat?*

A. *Right.*

THE COURT: *Is that the sole basis for your identification?*

THE WITNESS: *Yes.*

THE COURT: *The only basis?*

THE WITNESS: *Yes.*

THE COURT: *Not the face and the features?*

THE WITNESS: *The feature and the face and the black leather jacket.*

THE COURT: What I asked you was it only the black leather coat. If somebody else in that lineup, number 5 let's say was wearing a neat black leather coat, and Whitaker was not wearing a black leather coat, would you have picked him out?

THE WITNESS: Yes. By the face.

THE COURT: Would you have picked him out?

THE WITNESS: Yes.

. . . .

THE COURT: Who would you have picked out?

THE WITNESS: I would have picked out Mr. Whitaker.

THE COURT: You would have picked out number one anyway even if he wasn't wearing a black leather coat?

THE WITNESS: Yes.

(*Wade* Tr. 147–50 (emphasis added).)

After Cooke and Shiloh identified Raheem as Hill's killer, Raheem remained in police custody, but only in the *Gathers* case. For several weeks, he was not accused of the Hill homicide; and although the police investigation continued, the record does not indicate that it turned up any evidence against Raheem. The final twist in the Hill homicide investigation occurred a month after the lineup, when, according to Detective Crabb, Raheem summoned Crabb and confessed. At a pretrial *Huntley* hearing, *see People v. Huntley,* 15 N.Y.2d 72, 255 N.Y.S.2d 838, 204 N.E.2d 179 (1965), a proceeding to determine whether a confession should be suppressed, Crabb testified that Raheem had telephoned him and asked to meet with him. Raheem said Crabb had "put [Raheem's] tail in the soup" in the *Gathers* case by extracting from him a statement that subjected him to a charge of felony murder. (*Huntley* Hearing Transcript, January 6, 1977 ("*Huntley* Tr."), at 34.)

On February 23, 1976, Crabb met with Raheem in his cell. Raheem reiterated that Crabb had "put [Raheem's] tail in the soup" (*Huntley* Tr. 51) and began to talk to Crabb about the *Gathers* case. Crabb interrupted, stating that he was not allowed to talk to Raheem about that case because Raheem was represented by counsel, but that Crabb would like to talk about other matters. Crabb asked whether Raheem knew anything about the Hill case; Raheem stated that he did; Crabb gave him *Miranda* warnings.

Crabb testified that Raheem then asked what Crabb could do for him, and when Crabb answered that he could do nothing, Raheem confessed to the Hill murder and robbery. Crabb met with Raheem alone and was the only witness to the confession. He did not call in a stenographer to record Raheem's confession; nor did he ask Raheem to put the statement in writing. Crabb took notes during the conversation; but he did not show them to Raheem or ask Raheem to initial them. A few days later, Raheem was indicted for the murder of Hill, robbery, and criminal possession of a weapon.

C. *Raheem's First Trial*

Upon the conclusion of the *Wade* and *Huntley* hearings, the state trial court denied the motions to suppress. The court found the confession admissible because when it was given, Raheem was not represented by counsel with respect to the Hill

murder. The court concluded that the identifications were admissible because it found the lineup was not directed at Raheem and was not unfair:

> When [Cooke] went, he looked up and down and made an identification of number one, Mr. Whitaker; that he stated that he made the identification from his eyes and round face[ ] as well as a black leather coat and I may say that Mr. Shiloh stated that he made[ ] his identification from the face, but it was the black leather coat that convinced him it was the defendant, the number one person, who was there at the time.
>
> . . . .
>
> Counsel argues that the defendant's constitutional rights were violated in that it was an unfair lineup. I cannot under any stretch of the imagination see how this was an unfair lineup. First of all, it wasn't for the purpose of identifying the defendant to begin with. It was for the purpose of attempting to identify someone else as the perpetrator.
>
> Second, there was no testimony whatsoever that I heard of where anybody suggested or made any undue suggestions to any of the persons who viewed the lineup and I find the lineup was a proper lineup . . . .

(*Wade* Tr. 258, 260.)

Accordingly, at the ensuing trial, both Cooke and Shiloh were allowed to identify Raheem as the shooter. Moore testified that Raheem looked "very similar to" the shooter, but that Moore "wouldn't be too positive." (First Trial Transcript ("First Trial Tr.") 309.) Hayward and Dukes testified to the events but were unable to identify Raheem. Dukes said that when Hill was shot she had looked at the shooter's gun, not at what he was wearing; and although she knew he was wearing a coat, she had no idea what color it was or even whether it was light or dark. (*See* First Trial Tr. 357, 365.) Crabb was allowed to testify that Raheem had confessed. The jury convicted Raheem on all counts.

Raheem appealed his conviction, principally challenging the admission of the identification testimony of Cooke and Shiloh and the testimony of Crabb that Raheem had confessed. The New York Supreme Court, Appellate Division, found merit in the latter challenge. *See People v. Whitaker*, 75 A.D.2d 111, 428 N.Y.S.2d 691 (2d Dep't 1980) ("*Whitaker/Raheem I*"). The court found that Crabb's testimony as to Raheem's confession was inadmissible as a matter of State constitutional law as enunciated by the New York Court of Appeals in *People v. Rogers*, 48 N.Y.2d 167, 173, 422 N.Y.S.2d 18, 21, 397 N.E.2d 709 (1979), which had held that when an accused is represented by counsel on one charge, "information [as to another matter] obtained through . . . questioning in the absence of counsel may not be used against him," *id.* at 173 n. 2, 422 N.Y.S.2d at 22 n. 2, 397 N.E.2d 709. In *Whitaker/Raheem I*, the Appellate Division stated that

> [i]mplicit in *Rogers* is the conclusion that unless an accused has interposed a valid waiver, he is deemed to have been denied effective representation of counsel at a crucial stage of a criminal proceeding in a situation where, although represented by an attorney, he is subjected to an in-custody police interrogation without the attorney being present; and that it is immaterial whether or not the interrogation is related to the charge on which the attorney has been retained or assigned.

75 A.D.2d at 123, 428 N.Y.S.2d at 699. The *Whitaker/Raheem I* court ruled that *Rogers* was to be applied retroactively, *see id.*, that the confession described by Crabb should accordingly be suppressed, and that Raheem should have a new trial.

As to the identifications, however, the Appellate Division found that suppression was not warranted because Raheem was not a suspect at the time of the lineup, and there was

no evidence in the record to support a conclusion that the identification proceeding was not fairly conducted or that the identification of [Raheem] as the perpetrator was suggestively induced. In fact, the purpose of using [Raheem], a nonsuspect, in the lineup, was to insure that the procedure would be as fair as possible....

*Id.* at 125, 428 N.Y.S.2d at 700. The court further stated that even "assuming the identification of [Raheem] at the lineup should be suppressed because he was compelled to participate in it, the in-court identification of [him] had a sufficient independent origin." *Id.*

D. *Raheem's Second Trial*

At Raheem's second trial, held in 1981, Cooke and Shiloh again identified Raheem as the shooter. Moore and Hayward were unable to identify Raheem. Moore, for example, when asked whether he had gotten a look at the face of the man who shot Hill in January 1976, said, "No, not too good. I can't really say I did." (Second Trial Tr. 208.)

Q.... [D]o you see that man in court today? Would you look around, please, and tell me if you can see him.

A. I can't really identify him. I can't really say that's him [indicating Raheem] in all honesty.

Q. Do you see anybody who resembles him, who looks familiar [*sic*] to him?

. . . .

A. It could be him [indicating Raheem], and then it couldn't be him.

(Second Trial Tr. 209.) Hayward, who had been sitting next to Hill when Hill was shot, similarly was asked to look around the courtroom to see if he recognized the shooter. He indicated that he did not.

Cooke testified that on January 4, 1976, he had frequently glanced at Hill and the stranger near Hill and that he had no doubt Raheem was the man who shot Hill. When cross-examined as to whether he had recognized Raheem in the lineup only by his face, Cooke said, "[h]is face and his clothes" (Second Trial Tr. 194), and that he remembered "a black leather coat" (*id.*). Shiloh similarly identified Raheem as the shooter, saying that on the night of the robbery, Raheem had appeared to be a "very neat young man, dressed very neat, and he looked just like any other person who was dressed real neat" (Second Trial Tr. 110). Shiloh described what led him to recognize Raheem at the lineup:

Q. All right. Now, when you—when you looked at Mr. Whitaker the first time in the lineup did you notice what he was wearing?

A. He had a black leather coat.

Q. And how would you describe his over all appearance when you looked at him the first time in the lineup?

A. Still a neat person.

. . . .

Q. And did you notice these things the first time you looked at the lineup?

A. I did, yes, I did.

Q. Okay. But you didn't identify him at that time?

A. No.

Q. Now, *what was it that made you want to go back and look again?*

A. His face *and his black leather coat.*

Q. And did you recognize the face?

A. [Y]es.

Q. And *when you went back the second time to look at the lineup, what did you look at?*

A. I looked at his face *and that black leather coat.*

Q. And did you recognize the face?

A. Yes.

(Second Trial Tr. 110–11 (emphases added).)

The prosecution presented no other evidence to connect Raheem with the events at the Moulin Rouge. Although some fingerprints and a palm print had been collected from the bar and the getaway car, none matched the prints of Raheem. And although Moore testified that Hill, when shot, fell backwards onto the shooter and, because an artery had been hit, got "quite a bit" of blood on the shooter's coat (Second Trial Tr. 213–14), there was no evidence at trial of any bloodstain residue on the coat owned by Raheem. Indeed, the police detective who had headed the investigation and ordered "forensic examination" of the Moulin Rouge and "other items" testified that he did not recall any scientific tests being made on Raheem's coat. (Second Trial Tr. 268–69, 276.) The jury again found Raheem guilty.

Raheem again appealed, renewing his contention, *inter alia,* that the identifications of him were the product of an unconstitutionally suggestive lineup. The Appellate Division, though modifying Raheem's sentence, found, without discussion, that the constitutional challenge was "without merit," *People v. Whitaker,* 97 A.D.2d 555, 555, 468 N.Y.S.2d 168, 169 (2d Dep't 1983) ("*Whitaker/Raheem II* "). Leave to appeal to the New York Court of Appeals was granted; but as to the merits of Raheem's challenge to the identifications, that court stated that "[t]he lower court's determination that the lineup was not suggestive involves a mixed question of law and fact which is supported by the record and thus is beyond review in this court." *People v. Whitaker,* 64 N.Y.2d 347, 351 n. *, 486 N.Y.S.2d 895, 897 n. *,

476 N.E.2d 294 (1985) ("*Whitaker/Raheem III* ").

E. *The District Court's Denial of Habeas*

Raheem commenced his present habeas proceeding in August 1996, pursuing his contention that his due process rights were violated because the lineup was unduly suggestive and that the identifications should thus have been excluded. In a Corrected Memorandum and Order dated April 28, 2000, reported at 98 F.Supp.2d 295, the district court denied the petition. Although the court agreed that the lineup was impermissibly suggestive, it concluded that the identifications should be held reliable because there was other evidence of Raheem's guilt.

Applying the factors set forth in *Neil v. Biggers,* 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972), the district court found that

> the identifications simply d[id] not appear solid enough to outweigh the corrupting effect of the suggestive identification itself ... especially given that both witnesses acknowledged that the suggestive coat was a factor in their identifications.

98 F.Supp.2d at 305 (internal quotation marks omitted). The court went on to state, however, that the *Neil v. Biggers* factors

> do not exhaust the possible ways in which identification evidence may prove to be reliable or unreliable.... In my view, another critical factor should be taken into account before an otherwise unassailable jury verdict is set aside in a collateral proceeding: the evidence or lack of evidence that the petitioner is guilty of the crime of which he has been convicted.

*Id.* Applying its "proposed rule" that other evidence of guilt may make identification

testimony reliable, *id.* at 306, the district court found "three sources of corroboration in this case that together are sufficient to justify allowing the jury to decide the credence to be given to the eyewitness testimony," *id.* at 316. The three sources of corroboration were Raheem's possession of a black leather coat, his confession, and the fact that he was convicted of other murders, showing a "propensity . . . to kill":

> By far the most important is petitioner's confession, in which he admitted shooting Hill. . . . Another piece of corroborating evidence is the same thing that created the suggestiveness in the lineup: petitioner's three-quarter-length black leather coat, which he was wearing twenty days after the robbery. This was apparently no run of the mill garment. Arthur Shiloh explained that it was outstanding 'because it wasn't no cheap coat.' . . . Vincent Cooke also emphasized that the coat was memorable. . . . While the fact that petitioner was the only one in the lineup wearing such a coat made his identification suggestive, the fact that he had the coat a relatively short time after the robbery provides further corroboration of his guilt.
>
> Moreover, in addition to the foregoing evidence, the record demonstrates that petitioner has a propensity not only to kill, but a preference for doing so with a bullet to the head. . . . The murder of which he was convicted here was the first of four he committed within a twenty-day period. . . . While propensity evidence may not be admissible at trial because of the danger that the jury may condemn the accused because of other criminal behavior, and not because of the evidence of guilt of the crime charged, . . . this does not preclude giving such evidence some corroborative weight for present purposes.

*Id.* (internal quotation marks omitted). The court also found persuasive the facts that Raheem failed to assert his innocence and presented no alibi:

> The force of the corroborative evidence of guilt is hardly undermined by the absence of an alibi or any kind of a defense case. This is not a question of drawing an adverse inference from petitioner's failure to testify at trial or at the suppression hearing. Instead, it simply reflects the absence of the kind of evidence that would cause one to question whether the eyewitnesses identified the right man. . . . Not only was such an alibi not offered, but neither petitioner nor his lawyer asserted his innocence, even at sentencing. While both challenged the quality of the eyewitness identifications, neither ever said, "They got the wrong man!"

*Id.* at 317. In light of its corroborative findings, the court determined that

> [p]articularly in this unusual case, in which the suggestive identification procedure was inadvertent—and possibly not even unnecessarily suggestive—it would be bizarre to ignore such compelling evidence of guilt and grant the writ even though there is no reason for concern about the injustice that results from the conviction of an innocent person [which] has long been at the core of our criminal justice system . . . and which underlies the due process exclusionary rule at issue here.

*Id.* (internal quotation marks omitted). The court also found it irrelevant that evidence of the confession and of Raheem's "predisposition to kill with a bullet to the head," was not heard by the jury, noting that the court's "corroboration rule" was "not a harmless error analysis" but was instead an analysis of "a preliminary ruling on the admissibility of evidence." *Id.*

The district court granted a certificate of appealability; this appeal followed.

## II. DISCUSSION

On appeal, Raheem contends principally that the district court's proposed corroboration rule is constitutionally infirm in principle, and is infirm as applied here given the inadmissibility of the supposedly corroborating evidence. He also contends that the state courts' reliance on the fact that the lineup was not assembled with any suspicion of Raheem constitutes a misapplication of federal constitutional law. For the reasons that follow, we agree.

### A. Eyewitness Identifications and Due Process

■ Due process requires that criminal trials "proceed consistently with 'that fundamental fairness' which is 'essential to the very concept of justice.'" *Dunnigan v. Keane,* 137 F.3d 117, 125 (2d Cir.) (quoting *Lisenba v. California,* 314 U.S. 219, 236, 62 S.Ct. 280, 86 L.Ed. 166 (1941)), *cert. denied,* 525 U.S. 840, 119 S.Ct. 101, 142 L.Ed.2d 81 (1998). When the prosecution offers testimony from an eyewitness to identify the defendant as a perpetrator of the offense, fundamental fairness requires that that identification testimony be reliable. *See, e.g., Manson v. Brathwaite,* 432 U.S. 98, 112–14, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); *id.* at 114, 97 S.Ct. 2243 ("reliability is the linchpin in determining the admissibility of identification testimony"); *see also Watkins v. Sowders,* 449 U.S. 341, 347, 101 S.Ct. 654, 66 L.Ed.2d 549 (1981) ("It is the reliability of identification evidence that primarily determines its admissibility....").

■ When the defendant objects to identification testimony to be given by a witness who has identified him prior to trial, a sequential inquiry is required in order to determine whether either the prior identification or an in-court identification of the defendant at trial is admissible. The court must first determine whether the pretrial identification procedures unduly and unnecessarily suggested that the defendant was the perpetrator. *See* Part II.A.1. below. If the procedures were not suggestive, the identification evidence presents no due process obstacle to admissibility, *see, e.g., Jarrett v. Headley,* 802 F.2d 34, 42 (2d Cir.1986); no further inquiry by the court is required, and "[t]he reliability of properly admitted eyewitness identification, like the credibility of the other parts of the prosecution's case is a matter for the jury," *Foster v. California,* 394 U.S. 440, 442 n. 2, 89 S.Ct. 1127, 22 L.Ed.2d 402 (1969). If the court finds, however, that the procedures were suggestive, it must then determine whether the identification was nonetheless independently reliable. *See* Part II.A.2. below. In sum, the identification evidence will be admissible if (a) the procedures were not suggestive or (b) the identification has independent reliability. *See, e.g., Manson v. Brathwaite,* 432 U.S. at 114, 97 S.Ct. 2243; *Neil v. Biggers,* 409 U.S. 188, 199, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972); *United States v. Salameh,* 152 F.3d 88, 126 (2d Cir.1998), *cert. denied,* 525 U.S. 1112, 119 S.Ct. 885, 142 L.Ed.2d 785 (1999).

### 1. Suggestiveness

"A major factor contributing to the high incidence of miscarriage of justice from mistaken identification has been the degree of suggestion inherent in the manner in which the prosecution presents the suspect to witnesses for pretrial identification." *United States v. Wade,* 388 U.S. at 228, 87 S.Ct. 1926. Suggestive identification procedures "increase the likelihood of misidentification," and "[i]t is the likelihood of misidentification which violates a defendant's right to due process." *Neil v.*

*Biggers,* 409 U.S. at 198, 93 S.Ct. 375; *see generally Simmons v. United States,* 390 U.S. 377, 384, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968) (right to due process includes the right not to be the object of suggestive police identification procedures that create "a very substantial likelihood of irreparable misidentification"); *Stovall v. Denno,* 388 U.S. 293, 301–02, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967) (examining whether procedure was "so unnecessarily suggestive and conducive to irreparable mistaken identification that [defendant] was denied due process of law"); *Wray v. Johnson,* 202 F.3d 515, 524 (2d Cir.2000); *United States v. Maldonado–Rivera,* 922 F.2d 934, 973 (2d Cir.1990), *cert. denied,* 501 U.S. 1233, 111 S.Ct. 2858, 115 L.Ed.2d 1025 (1991).

■ A lineup is unduly suggestive as to a given defendant if he meets the description of the perpetrator previously given by the witness and the other lineup participants obviously do not. "Lineups in which suspects are the only participants wearing distinctive clothing or otherwise matching important elements of the description provided by the victim have been severely criticized as substantially increasing the dangers of misidentification." *Israel v. Odom,* 521 F.2d 1370, 1374 (7th Cir.1975). For example, where eyeglasses were "the outstanding feature of the assailant's appearance to the victim and an integral part of the description provided the police," a lineup in which the defendant was the only person wearing eyeglasses was unnecessarily suggestive. *Id.; see also United States v. Williams,* 469 F.2d 540 (D.C.Cir.) (per curiam), *cert. denied,* 409 U.S. 872, 93 S.Ct. 203, 34 L.Ed.2d 123 (1972); *id.* at 547 (opinion of Bazelon, C.J., concurring in part and dissenting in part, and joined in pertinent part by remainder of panel: Where the prior description of the gunman indicated that he did not wear a hat, "[t]he

showing in a lineup of four individuals wearing hats, along with a fifth, who was the prime suspect ... and who was bareheaded was clearly improper and unnecessarily suggestive." (internal· quotation marks and footnote omitted)); *id.* at 541–42 & n. 7 (for a witness who had stressed the youth and short stature of the perpetrator, a lineup in which the appellant was one of only two participants who could reasonably be characterized as short, and in which the other short participant was demonstrably much older, was unduly suggestive, for "the differences in physical appearance among the participants in the lineup had the predictable effect of focusing [the witness's] attention on appellant"); *id.* at 541 (majority opinion stating that the lineups described in Chief Judge Bazelon's opinion "would certainly not pass muster" under the principles enunciated in, *e.g., Wade* and *Stovall*). In *Solomon v. Smith,* 645 F.2d 1179, 1183 (2d Cir.1981), this Court found the pretrial identification procedures suggestive where, *inter alia,* an assailant had been described as 5′7″ tall and weighing 145 pounds and a lineup was held in which the defendant, who was 5′6″ tall and weighed 130 pounds, was the only person near that description—all but one of the other participants being four-to-six inches taller than the defendant and the remaining participant, though only two inches taller than the defendant, being 65 pounds (*i.e.,* 50%) heavier.

■ A lineup may be suggestive to one viewer even though it is not to another. Where one witness has emphasized a particular characteristic of the perpetrator in giving a description to the police, a lineup in which only the defendant has that characteristic may well taint the identification of the defendant only by that viewer. In *United States v. Williams,* for example, in which the main eyewitness had stressed that the young robber was only slightly

taller than 5'1", the lineup containing only one young man who was very short was suggestive to that witness, *see* 469 F.2d at 546 (opinion of Bazelon, C.J.) ("[w]e all agree that the Williams lineup was suggestive"), though it was not suggestive to other witnesses who "were not struck by the shortness of the offender," *id.* at 542 n. 7.

■ The defendant's protection against suggestive identification procedures encompasses not only the right to avoid methods that suggest the initial identification, but as well the right to avoid having suggestive methods transform a selection that was only tentative into one that is positively certain. *See, e.g., Solomon v. Smith*, 645 F.2d at 1185. While a witness is entitled to become surer of an identification, due process precludes the generation of that increased certainty through a suggestive lineup. *See, e.g., Simmons v. United States*, 390 U.S. at 383, 88 S.Ct. 967; *Dickerson v. Fogg*, 692 F.2d 238, 244–45 (2d Cir.1982); *Solomon v. Smith*, 645 F.2d at 1185; *cf. United States v. Wade*, 388 U.S. at 240–41, 87 S.Ct. 1926.

## 2. *Independent Reliability*

■ If the pretrial process was unduly suggestive, the court must then weigh the "corrupting effect of the suggestive[ness]" against other factors indicating that the identification may be independently reliable, *Manson v. Brathwaite*, 432 U.S. at 114, 97 S.Ct. 2243, for even a suggestive procedure "does not in itself intrude upon a constitutionally protected interest" if it did not contribute significantly to the identification of the defendant, *id.* at 113 n. 13, 97 S.Ct. 2243. *See, e.g., Coleman v. Alabama*, 399 U.S. 1, 5–6, 90 S.Ct. 1999, 26 L.Ed.2d 387 (1970) (plurality opinion of Brennan, J.) (no relief warranted by fact that one of the attackers wore a hat and

defendant Coleman was the only participant in the lineup to wear a hat, where it "d[id] not appear that [the witness's] identification of Coleman at the lineup was based on the fact that he remembered that Coleman had worn a hat at the time of the assault").

■ In determining whether a witness's in-court identification of the defendant has reliability independent of the unduly suggestive identification procedures, the court looks generally to the factors set out in *Neil v. Biggers*, taking into account "[1] the opportunity of the witness to view the criminal at the time of the crime, [2] the witness' degree of attention, [3] the accuracy of the witness' prior description of the criminal, [4] the level of certainty demonstrated by the witness at the confrontation, and [5] the length of time between the crime and the confrontation." *Neil v. Biggers*, 409 U.S. at 199–200, 93 S.Ct. 375; *accord Manson v. Brathwaite*, 432 U.S. at 114, 97 S.Ct. 2243. A good or poor rating with respect to any one of these factors will generally not be dispositive, *see, e.g., United States v. Concepcion*, 983 F.2d 369, 377 (2d Cir.1992), *cert. denied*, 510 U.S. 856, 114 S.Ct. 163, 126 L.Ed.2d 124 (1993), and in each case, the question of independent reliability must be assessed in light of the totality of the circumstances, *see, e.g., Neil v. Biggers*, 409 U.S. at 199, 93 S.Ct. 375; *Coleman v. Alabama*, 399 U.S. at 4, 90 S.Ct. 1999 (plurality opinion of Brennan, J.); *Stovall v. Denno*, 388 U.S. at 302, 87 S.Ct. 1967.

## B. *The Lineup's Suggestiveness as to Raheem*

■ In the present case, as the district court found and as the description in Part I.B. above of the record of the state-court proceedings demonstrates, the lineup in which Raheem appeared in his black leather coat was plainly suggestive to Cooke

and Shiloh. Those two witnesses had given the police descriptions that emphasized the shooter's black leather coat. Cooke, for example, testified that in giving the police "the best [description] that [he] could remember," he had "figured [the shooter] was about five[-]seven. I know he had on a black leather coat and he had on a black cap. That I can remember." (Second Trial Tr. 183.) Shiloh testified that he told a police detective that the shooter "was dressed very neat, brown skin, had a black leather coat and a cap. That's the best description." (*Wade* Tr. 130.) Indeed, "three quarter length black coat" (*Wade* Tr. 233) was the only part of any witness's description that was mentioned in the testimony of any police officer.

With respect to their selections of Raheem from the lineup, in which only Raheem appeared in a black leather coat, Cooke and Shiloh repeatedly mentioned the impact of the coat. Cooke testified that Raheem "appeared to be the one that I remember in the bar. And I could tell from his, you know—his coat is another thing. He had on a leather coat that I remembered." (*Wade* Tr. 147; *see also* Second Trial Tr. 194 (in the lineup, Cook was "struck" by the fact that Raheem was wearing "a black leather coat").) Shiloh, who at first failed to identify anyone in the lineup, testified that what made him want to view the lineup a second time was "[Raheem's] face and his black leather coat" and that when he returned to view the lineup a second time, he looked at Raheem's face "and that black leather coat." (Second Trial Tr. 111.) Shiloh stated that at the lineup "the black leather coat really set it off for me." (*Wade* Tr. 147.) Indeed, before prolonged questioning by the court eventually elicited from Shiloh the response that he would have selected Raheem from the lineup even if Raheem had not been wearing a black leather coat (*see*

*Wade* Tr. 149–50), Shiloh repeatedly said that his identification of Raheem was based, in whole or in part, on the coat:

Q. That black leather coat was outstanding in your mind?

A. Right, because it wasn't no cheap coat.

(*Wade* Tr. 147.)

Q. The fact that John Whitaker was wearing a black leather coat in this lineup and that one of the men in the bar that evening was wearing a black leather coat, you put those two facts together, is that right?

A. I am just going by what I saw what he was wearing. That is what I am talking about.

(*Wade* Tr. 148.)

Q. .... Mr. Shiloh, the elements that went through your mind at the time that you asked to make this identification, did you make the identification basically on the facts that the man in the bar on January the 4th was wearing a neat[ ] black leather coat and John Whitaker, number one in the lineup, was wearing a black leather coat?

A. Right

THE COURT: Is that the sole basis for your identification?

THE WITNESS: Yes.

THE COURT: The only basis?

THE WITNESS: Yes.

THE COURT: Not the face and the features?

THE WITNESS: The feature and the face and the black leather jacket.

(*Wade* Tr. 148–49.)

Accordingly, even the state trial court, which declined to suppress the identifications by Cooke and Shiloh, found that Cooke "stated that he made the identification from [Raheem's] eyes and round

face[ ] *as well as a black leather coat,"* and that "Shiloh stated that he made his identification from the face, but *it was the black leather coat that convinced him it was the defendant,* the number one person, who was there at the time." (*Wade* Tr. 258 (emphases added).)

Plainly, the black leather coat worn by the shooter at the Moulin Rouge was the outstanding feature of the assailant's appearance in the minds of Cooke and Shiloh, was an integral part of the description that each provided to the police, and was a critical factor in those witnesses' selection of Raheem from the lineup.

The State contends that the lineup was not suggestive because the goal was to present persons whose appearances were similar to that of Webb, the man the police had arrested as their suspect. This argument is wide of the mark. A lineup plainly may be nonsuggestive with respect to one participant but suggestive as to another where the appearances of the two are different and only the latter meets the viewing witness's prior description. To the extent that the State means to emphasize that its assemblage of a lineup that was suggestive as to Raheem was unintentional, that argument is immaterial. The purpose of excluding identifications that result from suggestive police procedures is not deterrence but rather the reduction of the likelihood of misidentification. *See, e.g., Thigpen v. Cory,* 804 F.2d 893, 895–96 (6th Cir.1986); *Green v. Loggins,* 614 F.2d 219, 222 (9th Cir.1980); *see generally Manson v. Brathwaite,* 432 U.S. at 112–14, 97 S.Ct. 2243 (question of whether the police procedures constituted misconduct is not determinative of whether an identification was suggestive). "It is certainly possible that an in-court identification by a prosecution witness may prove to be unreliable, even though the pre-trial encounter in question has not involved any culpable police con-

duct." *Green v. Loggins,* 614 F.2d at 222; *see also Israel v. Odom,* 521 F.2d at 1374 n. 7 (where witness had emphasized the assailant's eyeglasses, and there was no evidence to indicate that the police in any way suggested or required that the defendant wear his eyeglasses in the lineup, "[t]he suggestiveness of the identification procedure result[ed], not from police motive or misbehavior, but from the fact that [the defendant] was the only lineup participant to be wearing glasses"). Here, although it apparently was happenstance that Raheem was at the 77th Precinct when the lineup was being assembled for Webb, the fact remains that the most prominent feature that had been mentioned by Cooke and Shiloh in their descriptions to the police was the shooter's black leather coat. As to those witnesses, the appearance of Raheem as the only participant in the lineup wearing such a coat was unnecessarily suggestive.

The State also argues that the lineup should not be found suggestive because "one of the witnesses who viewed the lineup, Cecile Dukes, was unable to make an identification, despite her opportunity to observe the gunman on the night of the shooting. . . ." (State brief on appeal at 30.) But this argument proves too much: Dukes had not noticed details of the coat the shooter was wearing, or even whether his coat was light or dark (*see* First Trial Tr. 365). Thus, a lineup in which only one of the participants wore a black leather coat was not suggestive to Dukes. The only witnesses who selected Raheem from the lineup were Cooke and Shiloh, both of whom had noticed and described to the police the shooter's coat. And those witnesses clearly indicated that their selection of Raheem was influenced by his wearing such a coat. As to Cooke and Shiloh, the lineup was suggestive.

### C. *Reliability Independent of the Black Leather Coat*

 The question remains whether the identifications of Raheem by Cooke and Shiloh had reliability independent of the suggestive lineup. Looking to the *Neil v. Biggers* factors discussed in Part II.A.2. above, to wit, the witness's opportunity to view the criminal at the time of the crime, the witness's degree of attention, the accuracy of the witness's prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation, we note that most of those factors in this case give at best mixed signals and ultimately, in light of the circumstances as a whole, do not suggest reliability independent of the black leather coat.

The witnesses' opportunity to view the shooter was good in terms of the duration of the overall encounter. The robbers were in the Moulin Rouge for some 15 minutes before Hill was shot. On the other hand, Cooke felt that the bar was dimly lit, and he acknowledged that he was wearing "prescription shades" (Second Trial Tr. 189). We note that Cooke also testified that he saw the shooter again when the shooter came to the door of the bathroom where the bar patrons had been herded, to ask which key fit Moore's car (*see Wade* Tr. 162; Second Trial Tr. 177–78), though Moore's own testimony was that no one came to the bathroom to ask him about his keys (*see* Second Trial Tr. 215). The opportunity factor, on balance, seems to favor reliability.

As to the witnesses' degree of attention, Cooke and Shiloh testified that during the 15 minutes in question they frequently glanced at the strangers. On the other hand, they were also chatting, drinking scotch, and watching a football game. Further, immediately after they heard the shot and saw the shooter holding a gun, the hold-up was announced, and the man standing closest to Shiloh, Cooke, and Moore brandished his gun at them. Plainly their attention was immediately focused more on that man than on the man who had shot Hill; indeed, Shiloh testified that he did not pay any attention to the shooter after the second robber pointed his gun toward Shiloh, Cooke, and Moore. (Second Trial Tr. 126–27.) Further, it is human nature for a person toward whom a gun is being pointed to focus his attention more on the gun than on the face of the person pointing it. (*See, e.g.*, Second Trial Tr. 210) (Moore: "Actually, you're looking at the gun more than anything else, you know."); *see also* First Trial Tr. 357–58 (Dukes: ("I just looked at the gun. That's all I look. I didn't look at [the shooter].)") Thus, Cooke and Shiloh, independently of one another, selected the wrong person (one who was in prison at the time of the robbery) from a photo array as the gunman who had accosted them directly and taken their money and jewelry. The record provides no reason to believe that their attention to the face of the man who had shot Hill was any greater than their attention to the face of the man who directly robbed them at gunpoint, whom they misidentified.

Nor do the descriptions of the shooter given by Cooke and Shiloh to the police instill any confidence as to the reliability of their identifications of Raheem as the shooter independently of the black leather coat, for though they provided general information as to the shooter's age, height, and weight, they provided virtually no detail about his face. Cooke, for example, had said the shooter's face was round and without a moustache; but he had been unable to cite any other physical details. Although he mentioned the shooter's eyes, his recollection was not of a physical fea-

ture such as color, shape, or protrusion, *compare Dunnigan v. Keane*, 137 F.3d at 121 ("bugged eyes"); rather, his description of the eyes as "weird" (Second Trial Tr. 184) because of the shooter's "glare" or the manner in which he "fixed his eyes" (*Wade* Tr. 186) was merely a description of demeanor. "How could you describe his eyes? They were different. That's how I put it, something about it that stood out." (*Id.*) Cooke further testified that he "d[id]n't remember anything about the mouth" (*id.*) and had no impression "about the nose" (*Wade* Tr. 187). As the state trial court, in sustaining an objection to further probing at the *Wade* hearing, summarized Cooke's testimony, "He has already described to you, counsellor, what impression he had and he said *it was the round face and the eyes and that's all.*" (*Wade* Tr. 187–88 (emphasis added).)

Nor had Shiloh provided any details of the shooter's face, for he had not noticed his "features, his eyes . . . [o]r the shape of his head," or the length of his hair. (*Wade* Tr. 125; *see* Second Trial Tr. 122.) He testified in part as follows:

> Q. *Did you notice* at that time in the Moulin Rouge Bar, Mr. Shiloh[,] *anything distinctive* about John Whitaker?
>
> A. *The only thing I could see he was dressed very neat, very neat.*
>
> Q. Well, you told us that you saw a man smaller than a companion of his wearing a leather cap and a leather coat, and you say that man was dressed neatly. *Was there anything else about the[ ] person that you observed at that time that you retained in your mind?* ·
>
> A. *No.*

(*Wade* Tr. 124 (emphases added).)

Thus, the prior descriptions by Cooke and Shiloh of the shooter cannot be viewed as indicia of independent reliability as to their selection of Raheem. Indeed, far from having described any features that were distinctive, Shiloh testified that the shooter had "looked just like any other person who was dressed real neat." (Second Trial Tr. 110.)

The level of certainty exhibited by Cooke and Shiloh in their identifications was mixed. Cooke apparently showed no uncertainty in selecting Raheem. Shiloh, in contrast, at first identified no one. Even after selecting Raheem upon the second viewing, Shiloh said that he had "ha[d] a little doubt" and was "[n]ot positive" (*Wade* Tr. 147), stating that it was the black leather coat that decided it for him (*see id.*). To the extent that either Cooke or Shiloh exhibited certainty, we find it difficult to view that certainty as an indicator of reliability independent of the suggestive lineup, given their lack of recollection as to any physical features of the shooter's face (except, as to Cooke, its roundness). Whatever their certainty, it was engendered by the suggestive element itself, the black leather coat.

Finally, the length of time between the crime and the confrontation does not, given all the circumstances here, suggest reliability. While the time between the crime and the lineup—less than three weeks— was not great, it is noteworthy that Cooke and Shiloh, independently of one another, had made wrong identifications of the gunman closest to them from a photo array less than one week after the event. Thus, for Cooke and Shiloh, the three-week interval between the event and their selection of Raheem was hardly an indicator that their recollections of the shooter were reliable. We note also that the interval between the crime and the in-court identifications by Cooke and Shiloh at Raheem's second trial was more than five years. We see nothing to suggest that those witnesses' identifications of Raheem became more reliable during that period.

Given the poor ratings of Cooke and Shiloh on most of the *Neil v. Biggers* factors, and in light of the totality of the circumstances, which included their inability to describe any features of the shooter's face, the misidentification by both witnesses of the gunman who had been closest to them and had physically taken property from them, the fact that what both witnesses called the "best" description they could give of the shooter focused not at all on his face but emphasized his black leather coat (Second Trial Tr. 183 (Cooke); *Wade* Tr. 130 (Shiloh)), and the fact that both witnesses repeatedly cited the coat worn by Raheem as influential in their selection of him, we cannot conclude that the identifications by Cooke and Shiloh had reliability independent of the black leather coat.

### D. *The Corroboration Theory*

The State urges us to adopt the district court's view that the identifications by Cooke and Shiloh were reliable because of corroborative evidence of Raheem's guilt, to wit, Crabb's testimony as to Raheem's confession, the evidence that Raheem had committed other murders, and the fact that Raheem possessed a black leather coat. Even if we viewed these items as reliable evidence of guilt, we would decline to adopt such an analysis, which we believe confuses the due process inquiry with harmless-error analysis.

Reliability, in the identification context, means essentially that the witness's recollection was "[un]distorted," *Manson v. Brathwaite*, 432 U.S. at 112, 97 S.Ct. 2243, and proper inquiry seeks to fathom whether the witness's identification is worthy of reliance, that is, whether it provides a foundation on which the factfinder can reasonably depend. This inquiry differs from the inquiry into the trustworthiness of the verdict. For example, even where there

was irrefutable evidence of the defendant's guilt, if an identification were made by a witness who, it transpired, was not even present at the event, we could hardly term the identification reliable.

We read *Manson v. Brathwaite* as consistent with our view. In that case, the Supreme Court applied the *Neil v. Biggers* factors in determining that the identification at issue was reliable, and it then referred to trial evidence that was corroborative of guilt, noting, for example, the frequent presence of the defendant at the site of the illegal activity; but the Court stated that that evidence "plays no part in our analysis" of the identification's reliability. *Manson v. Brathwaite*, 432 U.S. at 116, 97 S.Ct. 2243. That observation in the majority opinion was further emphasized in Justice Stevens's concurrence:

> [I]n evaluating the admissibility of particular identification testimony it is sometimes difficult to put other evidence of guilt entirely to one side.... Mr. Justice Blackmun's opinion for the Court carefully avoids this pitfall and correctly relies only on appropriate indicia of the reliability of the identification itself."

*Id.* at 118, 97 S.Ct. 2243 (Stevens, J., concurring).

Thus, to the extent that some of our Sister Circuits have indicated that their assessment of an identification's reliability (as distinct from their harmless-error analysis) may include consideration of unrelated evidence corroborating the defendant's guilt, *see, e.g., United States v. Wilkerson*, 84 F.3d 692, 695 (4th Cir.1996), *cert. denied*, 522 U.S. 934, 118 S.Ct. 341, 139 L.Ed.2d 264 (1997); *United States v. Napoli*, 814 F.2d 1151, 1156–57, 1161 (7th Cir.1987), we disagree. We concur in the views of those courts that confine their consideration of unrelated corroboration of guilt to their assessment of whether the

error in admitting identification testimony resulting from unnecessarily suggestive procedures was harmless. *See, e.g., United States v. Rogers*, 126 F.3d 655, 659 (5th Cir.1997); *United States v. Emanuele*, 51 F.3d 1123, 1128 (3d Cir.1995). As the Third Circuit stated in *Emanuele*, resort to unrelated corroborative evidence is

> contrary to the Supreme Court's guidance in *Brathwaite* that other evidence indicating a defendant's guilt plays no part in our analysis of reliability.... We caution, therefore, that only factors relating to the reliability of the identification will be relevant to a due process analysis. Independent evidence of culpability will not cure a tainted identification procedure, nor will exculpatory information bar admission of reliable identification testimony. We will consider other evidence only to determine whether an error, if present, was harmless.

*Id.* (internal quotation marks omitted). We too conclude that evidence of record that is unrelated to an identification but that is supportive of a finding of guilt is properly considered in harmless-error analysis, not in the due process inquiry of whether the identification has reliability.

In addition, we note our difficulty with some of the factors that the district court cited in connection with its conclusion that the identifications by Cooke and Shiloh were reliable. For example, the view that the identifications by Cooke and Shiloh of Raheem in the lineup—which was suggestive precisely because Raheem alone was wearing a black leather coat—were reliable because Raheem "was wearing" a "black leather coat ... twenty days after the robbery," 98 F.Supp.2d at 316, has an air of circularity. The State submitted no proof that the coat worn by Raheem was the same coat worn by the shooter. Although the district court stated that "Cooke ... emphasized that the coat was memorable," *id.*, there was no evidence to suggest that either the shooter's black leather coat or that worn by Raheem had any distinguishing characteristics or unusual styling. Raheem's coat was not introduced at trial. The court did not elaborate on what made the shooter's coat "memorable," and, so far as we have seen in the record, neither did Cooke. Nor was scientific evidence offered to connect Raheem's coat to the events at the Moulin Rouge. The police detective in charge of the investigation, who had ordered forensic examination of the bar and "other items," testified that he did not recall whether any tests had been performed on Raheem's coat (Second Trial Tr. 268–69, 276) for any residue of the copious amounts of blood that Moore said had stained the coat worn by the shooter.

Nor do we view the confession described by Crabb or the "propensity" evidence as appropriate resources for determining the reliability of the identifications by Cooke and Shiloh. Such evidence might have been considered as factors in harmless-error analysis if it were admissible and had been admitted. But the confession evidence was inadmissible, *see People v. Rogers*, 48 N.Y.2d at 173 n. 2, 422 N.Y.S.2d at 22 n. 2, 397 N.E.2d 709 (as a matter of State constitutional law, "information obtained through ... questioning in the absence of counsel [may] not be used against a defendant"); and even if the propensity evidence had been admitted at trial to show, for example, a pattern indicative of Raheem's identity as the perpetrator, that prior-act evidence would not mean that other evidence that is unworthy of reliance would also be admissible.

We note also that we are not convinced, as was the district court, that the "evidence of [Raheem's] guilt" was "compelling," 98 F.Supp.2d at 317. Surely the

identifications by Cooke and Shiloh did not fall into that category; they were not even reliable. Nor would we place the confession evidence. in that category. Crabb's testimony was that Raheem first pointed out that he had gotten into difficulty by giving a statement to Crabb about the *Gathers* matter, resulting in a felony-murder charge; then, when Crabb said he wanted to talk about the Hill murder, Raheem asked what Crabb could do for him on that matter; and when Crabb responded that he could do nothing, Raheem promptly confessed. Further, Crabb, the only witness to that conversation, did not call in a stenographer or another officer, did not ask Raheem to write out his confession, and did not ask Raheem to review or initial Crabb's notes. Although the jury at Raheem's first trial apparently credited Crabb's testimony, as it plainly was entitled to do, we do not consider his testimony "compelling." And Raheem's possession of a black leather coat was hardly compelling, especially since the police either did not bother to test Raheem's coat for bloodstain residue, or did not find the results of such a test memorable.

We note, finally, our disagreement with the district court's reliance on the facts that Raheem failed to produce an alibi, failed to present a defense, and failed to "assert[ ] his innocence, even at sentencing," 98 F.Supp.2d at 317. As ingredients in the district court's analysis of the trial court's "preliminary ruling on the admissibility of evidence," *id.*, the last two facts are anachronistic. And none of them justified the admission in evidence of testimony that was not reliable.

### E. *Harmless–Error Analysis*

▆▆▆▆ An error is not harmless if it had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson,* 507 U.S.

619, 623, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) (internal quotation marks omitted). The principal factors to be considered in the determination of whether the erroneous admission of evidence was harmless are "the importance of the witness's wrongly admitted testimony, and the overall strength of the prosecution's case." *Wray v. Johnson,* 202 F.3d at 526. In assessing importance, we consider questions such as "whether the testimony bore on an issue that is plainly critical to the jury's decision, ... whether that testimony was material to the establishment of the critical fact or whether it was instead corroborated and cumulative, ... and whether the wrongly admitted evidence was emphasized in arguments to the jury." *Id.* (internal quotation marks omitted). The State has not argued here that error in the admission of the identifications by Cooke and Shiloh was harmless, and we conclude that it was not.

The identification testimony of Cooke and Shiloh clearly bore on an essential issue, the identity of the shooter. And that testimony was crucial to the prosecution's case, for the State presented no evidence other than the testimony of Cooke and Shiloh to tie Raheem to the events. None of the other persons who had been present at the Moulin Rouge could identify Raheem. And State law forbade the introduction of Crabb's testimony that Raheem had confessed.

Nor was any physical evidence offered to identify Raheem as the shooter. Although some fingerprints and a palm print had been gathered from the bar and from Moore's car, which the robbers used in their getaway, no prints matched those of Raheem. And although presumably the State had possession of the coat worn by Raheem in the lineup, and Moore testified that "quite a bit" of Hill's blood had gotten on the shooter's coat (Second Trial Tr.

213–14), there was no testimony that Raheem's coat bore any evidence of bloodstain residue.

It is hardly surprising, therefore, that in its summation, the prosecution emphasized the identification testimony of Cooke and Shiloh. As to the identity of the shooter, the State had presented nothing else. The error in admitting that testimony cannot be termed harmless.

## CONCLUSION

We have considered all of the State's arguments in support of the district court's decision and have found them to be without merit. The judgment dismissing the petition is reversed. The matter is remanded for entry of a judgment granting the writ, ordering that Raheem's convictions of offenses in connection with the murder and robbery at the Moulin Rouge on January 4, 1976, be vacated, and conditionally ordering that charges of those offenses be dismissed unless the State affords Raheem a new trial within 120 days. We note that because Raheem is serving concurrent prison terms of 25 years to life on the basis of other convictions as well, the judgment in this case does not require his release.