UNITED STATES of America,

v.

**Ronell WILSON, Defendant.**

No. 04–CR–1016 (NGG).

United States District Court, E.D. New York.

Nov. 24, 2006.

Order Clarifying Decision, Nov. 27, 2006.

---

Colleen Elizabeth Kavanagh, United States Attorney, Eastern District of New York, Jack Smith, U.S. Attorney's Office, Brooklyn, NY, for United States of America.

Ephraim Savitt, Mitchell Dinnerstein, Capital Defender Office, New York City, Kelley J. Sharkey, Attorney at Law, Brooklyn, NY, for Ronell Wilson.

### MEMORANDUM & ORDER

GARAUFIS, District Judge.

The Government alleges that Ronell Wilson ("Wilson") murdered undercover New York Police Department ("NYPD") Detectives Rodney Andrews ("Detective Andrews") and James Nemorin ("Detective Nemorin") on March 10, 2003. Based on these and other allegations, Wilson is charged with two counts of murder in aid of racketeering, two counts of robbery conspiracy, one count of attempted robbery, one count of carjacking, two counts of use of a firearm, and two counts of causing death through use of a firearm. (Second Superseding Indictment, Docket Entry No. 179.) The Government is seeking the death penalty against Wilson. Trial will begin on November 27, 2006.

Before the court is Wilson's motion to suppress (1) pretrial identifications of him based on a lineup and a photo array and (2) in-court identifications by the witnesses who made those pretrial identifications. For the reasons set forth below, Wilson's motion is DENIED.

### I. Background

On November 30, 2005, Wilson moved this court to hold a *Wade* hearing, named after *U.S. v. Wade*, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967) (establishing a right to counsel at post-indictment lineups), to determine whether to suppress lineup identifications made on March 12, 2003—the day of Wilson's arrest—and a photo array identification made on April 27, 2003. This court granted Wilson's motion and conducted a *Wade* hearing on October 5, 2006. At that hearing, the Government examined and Wilson cross-examined NYPD Lieutenant David Nilsen ("Lt.Nilsen") about the lineup identifications and retired NYPD Detective Gina O'Keefe ("Detective O'Keefe") about the photo array identification.

### II. Legal Framework

█ In cases decided after *Wade*, the Supreme Court established that a criminal defendant has a due process right not to be identified in court by a witness who first identified him out of court during a procedure "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. United States*, 390 U.S. 377, 384, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968). The same standard "with the deletion of the word 'irreparable'" applies when determining "the admissibility of testimony concerning the out-of-court identification itself." *Neil v. Biggers*, 409 U.S. 188, 198, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972).

█ In the Second Circuit, an out-of-court identification "will be admissible if (a) the procedures were not suggestive or (b) the identification has independent reliability." *Raheem v. Kelly*, 257 F.3d 122, 133 (2d Cir.2001); *Roldan v. Artuz*, 78 F.Supp.2d 260, 271 (S.D.N.Y.2000). In other words, even when a procedure is "unnecessarily" or "unduly" suggestive, "a district court may admit the evidence 'if, when viewed in the totality of the circumstances, it possesses sufficient indicia of reliability.'" *U.S. v. Bautista*, 23 F.3d 726,

729–30 (2d Cir.1994) (quoting *U.S. v. Simmons,* 923 F.2d 934, 950 (2d Cir.1991)).

■■■ Even if a pretrial identification procedure was so suggestive as to be inadmissible, an in-court identification by the same witness—as opposed to in-court testimony about his out-of-court identification—may nevertheless be admitted if it is independently reliable. *U.S. v. Thai,* 29 F.3d 785, 808 (2d Cir.1994); *United States v. Butler,* 970 F.2d 1017, 1021 (2d Cir. 1992). In determining whether the in-court identification is independently reliable, a court must consider "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." *Thai,* 29 F.3d at 808 (quoting *Neil v. Biggers,* 409 U.S. at 199–200, 93 S.Ct. 375 (1972)). "A good or poor rating with respect to any one of these factors will generally not be dispositive, and in each case, the question of independent reliability must be assessed in light of the totality of the circumstances[.]" *Raheem,* 257 F.3d at 135 (citations omitted).

## III. Discussion

### A. The Lineup Identifications

The lineup identifications at issue took place on March 12, 2003 in the presence of Larry Simon, Esq., a lawyer for Wilson. Simon objected at the time the lineup was conducted that the five non-suspects used as "fillers" had darker skin than Wilson and that some of them appeared older than Wilson.[1] (Simon Aff. ¶ 5.) After viewing a photograph of the lineup, this court agreed that the fillers had darker skin

than Wilson, but found that they did not appear older than him. (Order dated July 14, 2006 at 28.)

■■■ The first question this court must answer is whether the lineup and surrounding procedure were suggestive. "A lineup is unduly suggestive as to a given defendant if he meets the description of the perpetrator previously given by the witness and the other lineup participants obviously do not." *Raheem,* 257 F.3d at 134; see also *U.S. v. Wong,* 40 F.3d 1347, 1359–60 (2d Cir.1994) ("the principal question in determining suggestiveness is whether the appearance of the accused, matching descriptions given by the witness," stood out from the other participants so as to suggest that the suspect was the culprit) (citation and quotation marks omitted); *Solomon v. Smith,* 645 F.2d 1179, 1182–84 (2d Cir.1981); *U.S. ex rel. Cannon v. Montanye,* 486 F.2d 263, 266–67 (2d Cir.1973). A difference in skin color does not render a lineup impermissibly suggestive if it does not match the description of the perpetrator previously given by the witness. *Roldan,* 78 F.Supp.2d at 273–74. The court finds that the lineup and surrounding procedure used in this case were not suggestive.

During the *Wade* hearing, the government examined and Wilson cross-examined Lt. Nilsen, who oversaw the conduct of the lineup now at issue as well as the larger investigation into the murders of Detectives Andrews and Nemorin. (Tr. at 26–30.) Lt. Nilsen testified that four witnesses viewed the lineup and that three of them (Captain Vincent DiDonato, Sergeant Richard Abate, and one civilian witness) identified Wilson while the fourth (Officer Joel Six) did not identify anyone. *(Id.* at 30, 49.) Lt. Nilsen testified that none of

---

1. At the *Wade* hearing, Lt. Nilsen testified that, to his knowledge, Simon raised no objections to the lineup procedure. (Tr. at 49–

50.) For the purpose of deciding the present motion, I will assume that Simon did in fact raise the objections he claims to have raised.

the four witnesses was shown any photographs of Wilson prior to the lineup and that on the day the lineup was held, the four witnesses were separated from each other, Wilson, and the fillers before viewing the lineup. (*Id.* at 41–42.)

During cross-examination, the defense established that prior to identifying Wilson in the lineup, Captain DiDonato saw a photograph of Wilson's co-defendant Michael Whitten and stated that Whitten, not Wilson, might be the person he had seen on March 10, 2003 exiting a car used by Detectives Andrews and Nemorin. (Tr. at 63–64.) This fact may be important at trial because it is a reason to accord Captain DiDonato's identification of Wilson less weight, but it does not render his testimony inadmissible under *Simmons* and *Raheem.* For the purpose of deciding the present motion, this court must determine only whether Captain DiDonato's identification was the result of a suggestive procedure. His earlier identification of Whitten makes his subsequent identification of Wilson less credible, but it does not support a finding that the procedure pursuant to which he identified Wilson was suggestive.

Wilson also established that Lt. Nilsen did not ask the witnesses whether they had seen photographs of anyone arrested for the murders of Detective Andrews and Nemorim prior to viewing the lineup. (Tr. at 68.) This omission does not render the lineup procedure suggestive, nor would an affirmative answer to such a question. As noted above, "the principal question in determining suggestiveness is whether the appearance of the accused, matching descriptions given by the witness," stood out from the other participants so as to suggest that the suspect was the culprit. *Wong,* 40 F.3d at 1359–60 (citation and quotation marks omitted). Absent such a match, a "[d]ifferential in skin color between lineup participants does not violate

due process." *Roldan,* 78 F.Supp.2d at 273–274.

The lineup and surrounding circumstances in this case lack the features cited in cases finding suggestiveness. For example, in *United States v. Fernandez,* 456 F.2d 638 (2d Cir.1972), the Second Circuit held that a photographic array was impermissibly suggestive because (1) witnesses described the suspect as a light-skinned African–American male and (2) of the six photographs presented in the array, only that of the defendant depicted a light-skinned African–American male. No facts adduced at the *Wade* hearing in this case permit an inference of such a match between a prior description and the composition of the lineup.

Because I find that the lineup procedure was not suggestive, there is no need to consider whether the identifications made at the lineup were independently reliable, nor is there any reason to consider whether in-court identifications by these witnesses should be permitted under *Thai* and *Butler.* In addition, Wilson's request for an independent source hearing as to the lineup procedure is denied. (Tr. at 112.) As another court in this Circuit has explained,

> The purpose of an independent source hearing is to determine whether identification testimony made by a witness under suggestive circumstances has a separate independent source that would render it reliable. An independent source hearing need not be held when identification testimony is simply weak. There must be some sort of police or prosecutorial misconduct before the independent source hearing doctrine is imposed.

*Castillo v. Walsh,* 443 F.Supp.2d 557, 569 (S.D.N.Y.2006) (citations and quotation marks omitted). Here, there is no reason to believe any police or prosecutorial mis-

conduct occurred. Furthermore, when, as here, a "trial court f[inds] no indication of suggestiveness in the pretrial proceedings and determine[s] that trial counsel could address any potential suggestiveness of the in-court identification during the trial proceedings ... an independent source hearing [i]s not warranted." *Id.*

### B. The Photo Array

The photo array, conducted on April 27, 2003, depicted six African–American males with dreadlocks, including Wilson. (Order dated July 14, 2006 at 29; Def.'s Ex. 8.) Wilson does not claim that the array's composition was impermissibly suggestive on its face (Def.'s Mem. L. at 6), though he did argue that a hearing was necessary in order to determine whether the identification was conducted in an impermissibly suggestive manner (Order dated July 14, 2006 at 30). This court agreed, ruling that "the most cautious route would be to address this issue at [a] *Wade* hearing." (*Id.* at 31.)

■ "The fairness of a photo array depends on a number of factors, including the size of the array, the manner of presentation by the officers, and the array's content." *U.S. v. Maldonado–Rivera*, 922 F.2d 934, 974 (2d Cir.1990). An important "content" requirement is that "if a suspect is described only in terms of one characteristic, the filler photos in any array [sh]ould also portray people having that characteristic." *U.S. v. Eltayib*, 88 F.3d 157, 166 (2d Cir.1996). Wilson has not presented any arguments regarding the "size" or "content" factors, and this court finds independently that those factors favor admitting the photo array. This court further finds that the array was not conducted in a suggestive manner.

During the *Wade* hearing, the government examined and Wilson cross-examined Detective O'Keefe, the officer who along with her then-partner, Detective Wuensch, conducted the photo array on April 27, 2003. (Tr. at 8–10.) Detective O'Keefe testified that the witness shown the array had told the police at an earlier interview that on March 10, 2003—the day Officers Andrews and Nemorin were murdered—the witness saw his neighbor Omar Green in an elevator with two other men, one of whom the witness recognized but could not name. (*Id.* at 13.) When shown the photo array, the witness stated that the photo of Wilson depicted that man and signed a copy of the photo array indicating the same. (*Id.* at 14–17; *see also* Govt. Ex. 1.)

On cross-examination, the defense established that Detective O'Keefe did not know (1) who assembled the photo array, (2) on what basis that person selected the photos used in the array, (3) whether the witness was contacted by law enforcement between the two interviews, or (4) whether the witness had seen, in the media, pictures of the people arrested for the murder of Detectives Andrews and Nemorin. (*Id.* at 20, 22.) These facts do not render the photo array suggestive.

■ As in the case of the lineup procedure, the key question in determining the suggestiveness of this photo array is whether the "defendant ... meets the description of the perpetrator previously given by the witness and the other ... participants obviously do not." *Raheem*, 257 F.3d at 134; see also *U.S. v. Wong*, 40 F.3d 1347, 1359–60 (2d Cir.1994). It is not possible for that question to be answered in the affirmative because Wilson does not bear any particular characteristics that the other men in the photo array lack. Therefore, even if the witness was contacted by law enforcement and had seen a picture of Wilson in the newspaper—neither of which seems to have happened—those facts would go to the weight of the witness's testimony, not to its admissibility.

■ "Where a photographic identification procedure is so suggestive as to lead

to a substantial likelihood of irreparable misidentification, the government bears the burden of proving that the in-court identification will not be unduly tainted by the suggestive array based on the totality of the circumstances." *U.S. v. Camacho,* No. 04–CR–637 (ERK)(JMA), 2005 WL 1594257, at *8 (E.D.N.Y. July 5, 2005) (citing *Manson v. Brathwaite,* 432 U.S. 98, 114, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977) and *Biggers,* 409 U.S. at 199–200, 93 S.Ct. 375) (Korman, C.J.). Because this court has found that the photo array at issue was not suggestive—let alone so suggestive as to lead to a substantial likelihood of irreparable misidentification—there is no need for the government to prove an independent source for an in-court identification.

### IV. Conclusion

For the aforementioned reasons, Wilson's motion to suppress pretrial lineup and photo array identifications is DENIED. His request that the Wade hearing be re-opened so that additional witnesses be called is also DENIED.

SO ORDERED.

### *MEMORANDUM & ORDER ON RECONSIDERATION*

The Government alleges that Ronell Wilson ("Wilson" or "Defendant") murdered undercover New York Police Department ("NYPD") Detectives Rodney Andrews ("Detective Andrews") and James Nemorin ("Detective Nemorin") on March 10, 2003. Based on these and other allegations, Wilson is charged with two counts of murder in aid of racketeering, two counts of robbery conspiracy, one count of attempted robbery, one count of carjacking, two counts of use of a firearm, and two counts of causing death through use of a firearm. *(See* Second Superseding Indictment, Docket Entry No. 179.) The Government is seeking the death penalty against Wilson. Trial began on November 27, 2006.

Before the court is Wilson's oral motion, made after the close of testimony this evening, asking the court to clarify and reconsider its November 24, 2006 Order regarding whether Wilson may cross-examine cooperating witness Jesse Jacobus ("Jacobus") about Jacobus's mental health. That Order provided as follows:

It appears that three categories of mental health history are at issue: the witness's mental health during childhood, the witness's mental health at the time of the events as to which the witness will testify, and the witness's mental health at the time the witness testifies. The Second Circuit has explained that—

Evidence of a witness's psychological history may be admissible when it goes to her credibility. See Fed. R.Evid. 611(b). In assessing the probative value of such evidence, the court should consider such factors as the nature of the psychological problem, the temporal recency or remoteness of the history, and whether the witness suffered from the problem at the time of the events to which she is to testify, so that it may have affected her ability to perceive or to recall events or to testify accurately.

The trial court has discretion to limit such evidence if it determines that the probative value of the evidence is outweighed by its potential for unfair prejudice, confusion of the issues, or waste of time. *See* Fed.R.Evid. 403. Its decisions on these questions will not be overturned in the absence of an abuse of discretion.

*U.S. v. Sasso,* 59 F.3d 341, 347–348 (2d Cir.1995) (quotation marks and some citations omitted).

The court first considers the witness's history of childhood mental health prob-

lems. Because of the nature of those problems, their temporal remoteness from the events as to which the witness will testify, and the absence of any reason to believe that the witness suffered from them at the time of those events, the witness's childhood mental health problems are not relevant to this case and, if relevant, are more prejudicial than probative. The Government's motion [to preclude questioning] is therefore granted as to this witness's history of childhood mental health problems.

The court next considers the witness's mental health at the time of the events as to which the witness will testify. The parties have not provided sufficient evidence for the court to determine whether there is any basis for Wilson to inquire into the witness's mental health at that time. They are therefore ordered to inform the court by November 27, 2006 what information they have regarding the witness's mental health at the time of the events as to which he will testify. Should there be evidence that the witness suffered from mental health problems at the time of those events, this court may permit Wilson to question the witness about such problems.

Finally, the court considers the witness's mental health at the time at which the witness testifies. The Government has provided information suggesting that this witness has suffered from mental health problems since the events as to which the witness will testify. These problems may be relevant to the witness's ability to testify coherently and accurately at trial. The jury is entitled to know whether the witness's ability to do so is impaired. Wilson will therefore be permitted to question this witness as to mental health problems that may af-

fect the witness at the time at which the witness testifies.

Order dated November 24, 2006 at 4–6.

## I. Records Contemporaneous to Events as to Which Jacobus Will Testify[1]

It is the court's understanding that Jacobus underwent no mental health examinations between 1999—when his childhood examinations ended—and his 2003 incarceration. For that reason, there is no basis for the court to order the Government to provide Wilson with any records contemporaneous to the events as to which he will testify.

## II. Records Created During Jacobus's Incarceration

There is, however, a basis for the court to order the Government to provide Wilson with mental health records created after Jacobus was incarcerated. Such records may reflect on Jacobus's ability to accurately perceive the events as to which he will testify, which occurred in 2002 and 2003, and on his ability to testify coherently and accurately at trial about those events.

The court previously ordered that (1) "Should there be evidence that the witness suffered from mental health problems at the time of those events, this court may permit Wilson to question the witness about such problems," and (2) "Wilson will ... be permitted to question this witness as to mental health problems that may affect the witness at the time at which the witness testifies." (*Id.* at 5–6.) So as to effectuate those orders, the court now orders the Government to provide to Wilson all records of Jacobus's mental health created after Jacobus was incarcerated.

---

1. The court will issue a separate Memorandum and Order addressing Wilson's request for modification of its Order precluding Wilson from cross-examining Jacobus about Jacobus's mental health problems during childhood.

The court has reviewed those records and is aware that in some cases they are intermingled with medical records that do not bear on Jacobus's ability to perceive events or to testify accurately as to those events. The Government is ordered to provide intermingled records in their entirety. Wilson is ordered not to refer to any medical problems—as opposed to mental health problems—when cross-examining Jacobus.

Because of the sensitive nature of those records, defense counsel are directed not to disclose information contained in those records to Wilson unless the records are redacted as to all non-mental-health conditions and treatment. In no event shall the Defendant be provided with physical copies of such records. Should defense counsel wish to show any such records to Jacobus upon cross-examination, they must first confer with the Government and agree as to which portions of those records will be redacted. At the conclusion of Jacobus's testimony, mental health records shown to him, as redacted, shall be placed under seal. Defense counsel shall immediately return to the Government all mental health and medical records not shown to Jacobus.

## III. Conclusion

For the aforementioned reasons, Wilson's motion for clarification is GRANTED with regard to mental health records created during Jacobus's incarceration.

SO ORDERED.