[908 NYS2d 817]

THE PEOPLE OF THE STATE OF NEW YORK, Plaintiff, v DELROY
BULGIN, Defendant.

Supreme Court, Bronx County, July 12, 2010

## APPEARANCES OF COUNSEL

*Bronx Defenders* (*Justine Olderman* and *Michael Oppenheimer* of counsel), for defendant. *Robert T. Johnson, District Attorney* (*Gina Torres* and *Aaron Kaplan* of counsel), for plaintiff.

## OPINION OF THE COURT

MIRIAM R. BEST, J.

For the reasons that follow, defendant's motion to suppress identification testimony is granted in part and denied in part.

## Introduction

Defendant is charged with criminal contempt in the first degree (Penal Law § 215.51 [d]), criminal contempt in the second degree (Penal Law § 215.50 [3]), criminal mischief in the second degree (Penal Law § 145.10), two counts of menacing in the second degree (Penal Law § 120.14 [1]), unlawfully fleeing a police officer in a motor vehicle in the third degree (Penal Law § 270.25), two counts of criminal possession of a weapon in the fourth degree (Penal Law § 265.01 [2]), reckless endangerment in the first degree (Penal Law § 120.25 [1]) and reckless driving (Vehicle and Traffic Law § 1212). Defendant moved to suppress the complainant's identification of him as the perpetrator, both as the tainted fruit of an unlawful arrest and because "[t]he identification is not reliable because it is the product of an unnecessarily suggestive identification procedure." By decision dated March 3, 2009, the Honorable Judith Lieb ordered that a combined *Wade/Dunaway* hearing be conducted on those issues.

This court held the *Wade/Dunaway* hearing on May 6, 7, 14 and 17, 2010.[1] The People called Police Officer Shawn O'Dwyer, Detective Sharon Harvey, Charles T. Williamson, and Detective

---

1. There are two complainants in this case, Inez Goodwin and Charles Williamson. In a decision dated January 16, 2009, Justice Lieb denied defendant's motion to suppress identification evidence of Inez Goodwin, as she and defendant were known to each other for approximately 12 years and had been

Steven Swindell. Defendant called Assistant District Attorney (ADA) Gina Torres, and recalled both Officer O'Dwyer and Mr. Williamson as defense witnesses. The court found that each witness was credible. Based on the hearing testimony, the court makes the following findings of fact and conclusions of law.

## Findings of Fact

Early on the morning of August 24, 2008, Charles T. Williamson took his girlfriend, Inez Goodwin, to work at [redacted], where Mr. Williamson also used to work (H 117, 142-143, 144-145, 148).[2] After Ms. Goodwin entered the building, Mr. Williamson saw her speaking with defendant, Delroy Bulgin. Mr. Williamson watched this conversation for about five minutes from less than 10 feet away and then he approached them to find out what was going on. Although Mr. Williamson had never met defendant before, Ms. Goodwin had spoken about him to Mr. Williamson and had told Mr. Williamson that she had had problems with defendant in the past (H 150-151). Mr. Williamson also observed that Ms. Goodwin looked uncomfortable, as though she did not want to have any problems with defendant at her workplace (H 147-148). Mr. Williamson told defendant that he did not belong there and asked him to leave. Defendant kept saying that he just wanted five minutes to talk with Ms. Goodwin, but Mr. Williamson replied that there was nothing to talk about and he should leave (H 148). This conversation lasted 10 to 15 minutes (H 146-150).

The next day, August 25, 2008, at about 5:30 A.M., defendant's car crashed into Mr. Williamson and Ms. Goodwin's minivan on Noble Avenue in the Bronx. Police Officer Shawn O'Dwyer and his partner, Officer Bluas, were in uniform in a marked police car on patrol in the 43rd Precinct at that time. As the officers were traveling westbound on Story Avenue, approaching the intersection of Noble Avenue, Officer O'Dwyer heard a loud bang to his left, which he thought might have been a car accident. He saw Mr. Williamson and Ms. Goodwin in a minivan at the corner of Story and Noble Avenues. Mr. Williamson flagged the officers down, leaning out of his window and point-

---

involved in an intimate relationship for approximately four years. Accordingly, the hearing only concerned the identification by Mr. Williamson.

**2.** References to the hearing transcript are preceded by an "H."

ing behind him, indicating to Officer O'Dwyer that something was going on (H 13-15, 20, 33, 57, 151-152, 154, 163).[3]

Officer O'Dwyer drove southbound on Noble Avenue and saw a gray or silver Acura about one-half block away, being driven by defendant, backing up. Defendant's car was the only car that Officer O'Dwyer saw driving on Noble Avenue at that time. Officer O'Dwyer immediately turned his lights on in order to stop defendant's car and investigate what he had heard, but defendant put the car in drive and drove past the police car. Officer O'Dwyer then made a U-turn and followed defendant's car northbound on Noble Avenue, approximately 15 feet behind the Acura (H 18, 40-42, 71). At the intersection of Noble and Story Avenues, defendant failed to stop at the stop sign and turned right onto Story Avenue (H 16, 46). Defendant proceeded eastbound on Story Avenue to the intersection of Story and Rosedale Avenues, where he failed to stop at a steady red traffic light and turned left onto Rosedale (H 16-17). Officer O'Dwyer was approximately 15 to 20 feet from defendant at this point, with both lights and sirens on (H 48-50, 71-72). Defendant drove northbound on Rosedale Avenue to the intersection of Rosedale and the Bruckner service road, where he again failed to stop at a steady red traffic light and turned right onto Bruckner Boulevard (H 16-17). Officer O'Dwyer followed defendant's car for a minute or two and never lost sight of it. Approximately two tenths to two thirds of a mile later, defendant pulled over at a 45-degree angle and exited the Acura. When defendant's car stopped, Officer O'Dwyer saw damage to its left front quarter panel. Defendant was arrested without incident and transported back to the 43rd Precinct (H 17-20, 51-52, 56, 71).[4]

As he was following defendant's car, Officer O'Dwyer saw that it was pulling slightly to the left and handling "poorly" (H 73-74, 79). He believed that defendant swerved to avoid hitting the police car as the Acura passed it on Noble Avenue, but he did not form an opinion as to whether defendant intentionally moved the car to the left or whether the "pulling" was the fault

**3.** Officer O'Dwyer recalled that Mr. Williamson said something to him as he passed the minivan and followed defendant's car, but at the time of the hearing he did not remember the substance of their conversation (H 33, 39).

**4.** Officer Bluas had his gun out when he and Officer O'Dwyer approached defendant's stopped car, but no testimony was elicited as to whether he was pointing the gun at defendant or holding it to his side (H 51-52).

of the car itself (H 73-74, 81). Office O'Dwyer described the traffic conditions as "light." He did not recall seeing any other cars or pedestrians during his pursuit of defendant, and he was certain that there were no other cars on Rosedale Avenue (H 25-26, 50). Defendant was traveling between approximately 20 and 30 miles per hour on Noble Avenue and later between 40 and 50 miles per hour. The speed limit on Story and Rosedale Avenues was posted at 30 miles per hour, and may have been 35 miles per hour on the Bruckner (H 18-19, 73).[5]

Mr. Williamson and Ms. Goodwin went to the 43rd Precinct "[r]ight after the accident" (H 153). When they arrived there, Mr. Williamson explained to the desk officer "what's occurring" and then the officers took them to a room "to sit down and wait" (H 154-155). They were waiting in the room when Officer O'Dwyer arrived at the precinct with defendant.[6] Defendant was brought to the front desk, a pedigree sheet was filled out and he was placed in a holding cell (H 61). Mr. Williamson saw defendant being brought into the station by "a lot" of officers. Defendant was in handcuffs, with his arms behind his back and his head and chest forward. Mr. Williamson did not recall how long he saw defendant at that time but estimated "less than about two, three minutes" (H 157-160, 183). Mr. Williamson also heard defendant speaking and recognized his voice, although he did not know what defendant was saying (H 156-157, 160). Thereafter, Officer O'Dwyer learned that Mr. Williamson and Ms. Goodwin were at the precinct and he spoke with them. He learned that defendant had driven past them and brandished a knife toward Mr. Williamson from inside his car. Mr. Williamson had decided to drive to the precinct to avoid a confrontation and, while en route there, defendant hit Mr. Williamson's car with his car (H 24-25, 64-66, 156). Officer O'Dwyer filled out a complaint report after speaking with Mr. Williamson and Ms. Goodwin, but did not conduct any identification procedure (H 27).

At some point on August 25, defendant was taken to Central Booking, where his photo was taken and saved to the New York

---

**5.** Officer O'Dwyer testified on cross-examination that defendant did not speed up as he took the turns onto Story, Rosedale or Bruckner (H 50). Accordingly, defendant must have sped up after turning from Noble onto Story Avenue.

**6.** Officer O'Dwyer had not seen Mr. Williamson's minivan at any point after he passed it at the intersection of Story and Noble Avenues (H 45).

Police Department's computerized photo manager system (H 229, 232-233).[7]

At about 6:30 P.M. that same day, Officer O'Dwyer, Mr. Williamson and Ms. Goodwin were at the complaint room of the District Attorney's office (H 117, 161, 164). Because Officer O'Dwyer had not conducted any identification procedure, Detective Sharon Harvey from the 45th Precinct, who was at the complaint room on an unrelated matter, was asked to show a photo array to Mr. Williamson (H 27, 84-85, 120-121, 165). The photo array, containing six photographs, was generated in the Bronx District Attorney's Detective Squad using the photo manager system (H 91, 100, 104).[8] Mr. Williamson knew that he was going to be shown some photos to see if he could pick out the person he "had the situation with," but no one told him how many or whose photos he was going to see and he was not told that he would be seeing a photo of defendant (H 90, 122-123, 135-136, 165-166). Detective Harvey put the photo array in front of Mr. Williamson and asked him to indicate whether any photo was familiar to him (H 167). He identified defendant's photo, which was No. 3, initialed and dated the array and wrote a brief statement on the document, "Stalking girlfriend and running us off road" (H 89, 121-122).[9] Mr. Williamson testified

---

**7.** Officer O'Dwyer did not recall who transported defendant to Central Booking (H 246).

**8.** Photo arrays in the NYPD's computerized photo manager system are saved in the form in which they are generated, and, once saved, the photos cannot be moved around (H 215, 229).

**9.** Detective Harvey had no recollection of whether she compiled the photo array or whether the photos were in color or black and white (H 91, 100, 104). Mr. Williamson also could not recall whether he was shown a color photo array or a black and white one on August 25, 2008 (H 136). The People introduced a black and white copy of the photo array which bore Mr. Williamson's signature and the statement written by him as People's exhibit PX 2. They also introduced a blank color copy of that photo array as PX 3, which was generated on July 1, 2009 (H 198-199, 200-201, 203). The People introduced a color copy of the photo array containing the data associated with each photograph, specifically, the arrest number, date of arrest, photograph and the New York State identification number of the fillers, as PX 4 (H 217-221). The same six photographs are in each of these three exhibits and defendant's photo is in position number 3 in each exhibit (H 221, 225). Finally, the People introduced defendant's arrest photos, a "front shot" and a "side shot," from August 25, 2008, as PX 5; the front shot was the one included in PX 2, 3, and 4 (H 224-225, 231-232).

Mr. Williamson testified that, after he selected defendant's photo from the array, he was "pretty sure" that someone told him he had "picked the correct

unequivocally that he selected defendant's photo because he recognized his face from their confrontation (H 263).

Approximately 16 months later, on December 7, 2009, Mr. Williamson met ADA Gina Torres at her office in order to prepare for the hearing and trial in this case. Ms. Goodwin did not come with him (H 137, 171-172). During that meeting, ADA Torres told Mr. Williamson what would happen at the hearing and "I said something to the effect of, and at that point I am going to show this to you," and she held up PX 3, the blank, color photo array. Mr. Williamson pointed to defendant's photo and said, "That's the guy." He did not recall whether he saw his own handwriting on the document at that time, because "[s]he picked it up so fast." ADA Torres then gathered up her papers to confer with one of her colleagues and Mr. Williamson saw PX 2, the black and white photo array, on her desk; he reached over, pointed to defendant's photo and said, "That's him again" (H 138-141, 175-177, 189-191, 197-198).

### Conclusions of Law

### The Parties' Contentions

Defendant argues that he was unlawfully arrested, and that the arrest photo used in the photo arrays was the "fruit" of the unlawful arrest. This unlawful "fruit" was not attenuated by probable cause that Officer O'Dwyer obtained from further investigation following defendant's arrest. Moreover, Mr. Williamson's observation of defendant at the precinct on August 25, 2008 was an unnecessarily suggestive identification procedure that tainted the witness's ability to make a reliable identification from the photo array later that same day, because the showup itself was unnecessarily suggestive, because the photo in the array showed defendant in the same clothing as he was wearing when he was brought into the precinct in handcuffs, surrounded by police, and because Mr. Williamson was continuously with Ms. Goodwin at the precinct.[10] Crucially, defendant does not argue that the photo array itself was unnecessarily suggestive (A 21-22).[11] He also concedes that there is no evidence that Mr. Williamson gave the police a description of him

---

person or that I had the infraction with at the time," but he did not recall who that was (H 170-171).

**10.** When Mr. Williamson saw the photo array, however, he was alone in the room with Detective Harvey (H 161-162, 165).

**11.** References to the minutes of the oral argument are preceded by an "A."

including his clothing as a significant factor (A 29). Finally, defendant argues that Mr. Williamson's subsequent viewings of PX 3 and PX 2 at ADA Torres's office on December 7, 2009 were unnecessary identification procedures that also tainted his ability to make a reliable in-court identification. Defendant argues that the court should conduct an independent source hearing to ensure that Mr. Williamson's in-court identification testimony at trial is not tainted by these earlier identification procedures.

The People argue that there are no grounds to suppress identification testimony. They argue first that the arrest was based on probable cause, because Officer O'Dwyer saw defendant drive over the speed limit and commit a number of traffic infractions. Even if there were no probable cause to arrest on these bases, Officer O'Dwyer subsequently obtained probable cause to arrest defendant after interviewing Mr. Williamson and Ms. Goodwin at the precinct, which attenuated the photo used in the photo spread from any illegality in the arrest (A 50-51). Further, the witness's observation of defendant at the precinct was not a police-arranged identification procedure. As to the identification from the photo array, there was no evidence that defendant's clothing played any role in it; rather, Mr. Williamson recognized defendant's face. Indeed, according to the People, the identification from the photo array was merely confirmatory, because Mr. Williamson had already pointed out defendant to the police on the street in an identification that was not police-arranged. Thus, every identification subsequent to the on-street point-out was merely confirmatory and should not be suppressed. Moreover, there was no "identification procedure" on December 7, 2009 of which the People had to give any notice (albeit they did so), but merely permissible trial preparation. Finally, even if the out-of-court identifications had to be suppressed, the record from the hearing establishes that Mr. Williamson had an independent source for an in-court identification.

## Analysis

The court understands that the issues to be resolved are these. First, was it lawful for the police to take defendant's photo on August 25, 2008, and use it to create a photo array? That is, was the arrest photo the "fruit" of an unlawful arrest

that was not based on probable cause?[12] Second, was the accidental precinct showup a "fruit" of that arrest? Third, was the showup an unduly suggestive identification, and if it was, did it taint Mr. Williamson's subsequent photo identification? Next, was Mr. Williamson's subsequent viewing of both the photo array that he had previously signed (PX 2) and an unsigned color copy of same photo array (PX 3) approximately 16 months after his confrontation with defendant an unduly suggestive identification? Finally, if any of the out-of-court identifications was unduly suggestive, is there an independent source for Mr. Williamson to make an in-court identification, or must the court conduct further hearings?

## The "Fruit" of Defendant's Arrest

At a suppression hearing, it is the People's burden to demonstrate the legality of the police conduct in the first instance, but defendant bears the ultimate burden of proving, by a preponderance of the credible evidence, that the evidence should not be used against him and that the police lacked probable cause to arrest him. (*People v Thomas*, 291 AD2d 462, 463 [2d Dept 2002]; *People v Sidhom*, 204 AD2d 150 [1st Dept], *lv denied* 84 NY2d 832 [1994].)

It is undisputed that Officer O'Dwyer was justified in stopping defendant's car after he saw defendant commit several traffic infractions (Ms. Olderman: "So, clearly he had probable cause to see he committed a traffic infraction" [A 9]) (*People v Robinson*, 97 NY2d 341, 349 [2001] ["We hold that where a police officer has probable cause to believe that the driver of an automobile has committed a traffic violation, a stop does not violate article I, § 12 of the New York State Constitution"]). Indeed, the *Robinson* Court clearly held that "[a] police officer who can articulate credible facts establishing reasonable cause to believe that someone has violated a law has established a reasonable basis to effectuate a stop" (97 NY2d at 353-354).

---

12. The court need not address whether the actual composition of the photo array was suggestive, as defendant concedes that it was not (A 21-22). In any event, the court holds that the photo array itself was fair and nonsuggestive. It contains photos of six African-American males with short hair, similar facial hair, and similar complexions. They appear to be of similar age. Their clothing is also similar. Two of the men wear what appear to be t-shirts, three of the men, including defendant, wear shirts with collars, and one man wears what appears to be a jacket with a collar. While defendant is the only person wearing a plaid shirt, the person in the photo below his is wearing a shirt with similar colors.

While conceding the legality of the stop, however, defendant challenges the propriety of his full-blown arrest, relying on *People v Howell* (49 NY2d 778 [1980]) and *People v Marsh* (20 NY2d 98 [1967]). Defendant argues that Officer O'Dwyer had no information about his alleged criminal conduct toward Mr. Williamson and Ms. Goodwin at the time of the arrest, and therefore did not have probable cause to arrest him for criminal contempt, menacing or reckless endangerment with respect either to the alleged car accident or to the alleged confrontation of the day before. Nor did Officer O'Dwyer have probable cause to arrest him for any misdemeanor committed in his presence: reckless endangerment was not made out, because there was no testimony that any pedestrians or other cars were on the road; unlawfully fleeing a police officer in a motor vehicle was not made out, because the testimony did not establish that defendant knew Officer O'Dwyer was trying to pull him over and there was no evidence that defendant was driving more than 25 miles per hour above the speed limit or in a reckless manner; and reckless driving was not made out because defendant did not speed up as he passed through the stop sign or the red lights and there was no evidence that anyone was endangered by his driving. Thus, according to defendant, Officer O'Dwyer should have given him a summons for the traffic infractions and let him go. Because traffic infractions are not supposed to yield "fruits" (*see People v Marsh*, 20 NY2d at 101 ["It is obvious that, except in the most rare of instances, there can be no 'fruits' . . . of such infractions"]), no arrest photo should have been taken on August 25, 2008, and no photo array prepared with it. Although defendant concedes that Officer O'Dwyer's intervening interview with Mr. Williamson and Ms. Goodwin at the precinct "gave the officer probable cause of a different nature to believe that he actually committed a crime as opposed to a traffic infraction, that nevertheless, that photo identification procedure and identification . . . by Mr. Williamson of Mr. Bulgin[ ] is fruit of that unlawful arrest" (A 4-11, 13).

The People argue that Officer O'Dwyer had probable cause to arrest defendant for reckless driving and violating traffic laws in his presence. Vehicle and Traffic Law § 1212 defines reckless driving as "driving or using any motor vehicle, . . . in a manner which unreasonably interferes with the free and proper use of the public highway, or unreasonably endangers users of the public highway." The evidence at the hearing established that defendant drove 5 to 15 miles per hour above the speed limit

and failed to stop at one stop sign and two steady red lights during a period of some two minutes, but there was no evidence that any pedestrians or other drivers were affected in any way. This did not give Officer O'Dwyer probable cause to arrest defendant for the misdemeanor of reckless driving. (*Cf. People v McGrantham*, 12 NY3d 892 [2009] [evidence supported charge of reckless driving where defendant, who mistakenly drove onto exit ramp, slowly made a U-turn across three lanes of traffic and collided with motorcycle]; *People v Armlin*, 6 NY2d 231, 233 [1959] [specific factual allegations in indictment that defendant drove car across center line into path of oncoming car at high rate of speed, and crashed into that car, sufficient to permit inference that defendant's operation of vehicle unreasonably interfered with free and proper use of highway and unreasonably endangered users thereof]; *People v Cooper*, 38 AD3d 678 [2d Dept 2007] [officer had probable cause to believe defendant committed misdemeanor of reckless driving where he saw defendant driving at unreasonable speed, in wrong lane of travel, sideswiping parked police vehicle and passing through three-way intersection against traffic light]; *People v Cobb*, 172 Misc 2d 851 [App Term, 1st Dept] [trial evidence sufficient to support reckless driving conviction where defendant, during evening rush hour on well-traveled street, abruptly changed gears, car lunged forward and struck another car, then lunged backward to within two feet of pedestrian crosswalk, while complainant was in front passenger seat with door open and one leg hanging out], *lv denied* 90 NY2d 856 [1997]; *Matter of Vincent H.*, 3 Misc 3d 900, 904-905 [Fam Ct, Queens County 2004] [evidence at fact-finding hearing sufficient to establish that defendants' operation of their motor scooters was so reckless as to interfere unreasonably with free and proper use of streets and sidewalks where they crisscrossed from one side of street to the other, drove into oncoming traffic, drove onto sidewalk to avoid police car and caused pedestrians to move out of the way quickly to avoid being struck], *affd* 16 AD3d 585 [2d Dept 2005].)

Vehicle and Traffic Law § 155 states, "For purposes of arrest without a warrant, pursuant to article one hundred forty of the criminal procedure law, a traffic infraction shall be deemed an offense." CPL 140.10 (1) (a) provides that "a police officer may arrest a person for: (a) [a]ny offense when he has reasonable cause to believe that such person has committed such offense in his presence." These statutes therefore give the police the op-

tion to arrest a motorist who commits a traffic infraction in their presence. Indeed, the Court of Appeals in *Marsh* explicitly recognized that an officer may arrest a motorist who commits a traffic infraction in his or her presence, stating,

> "since a traffic violation may serve as a predicate for an 'arrest without a warrant, pursuant to section [177] of the code of criminal procedure' (Vehicle and Traffic Law, § 155), the only question with regard to search and seizure is whether the officer is empowered to conduct a search as incident to such a lawful arrest" (20 NY2d at 101).

But the practice of effectuating a full-blown arrest for a traffic infraction is clearly disfavored.[13] (*People v Marsh*, 20 NY2d at 101; *People v May*, 52 AD3d 147, 149 [1st Dept 2008] [suppression of physical evidence proper where initial approach of double-parked car by police for traffic violation was proper, but continued detention after defendant provided license and registration and warrant check was "no hit" was unlawful, because police lacked reasonable suspicion that criminal activity was occurring or imminent]; *People v Berberena*, 264 AD2d 670 [1st Dept 1999] [stop of car for traffic violation justified, but allegedly nervous behavior of minimal and equivocal nature did not provide founded suspicion of criminality sufficient to justify accusatory inquiry and request to search trunk], *lv denied* 94 NY2d 901 [2000]; *People v Barreras*, 253 AD2d 369, 373 [1st Dept 1998] [police properly stopped defendant's car for failing to stop at stop sign, but once defendant's papers were found to be in order officers should have issued summons; no justification for prolonging stop and asking to search car]; *see also Santiago v City of New York*, 2002 NY Slip Op 40036[U] [Sup Ct, Bronx County 2002] [police had no right to arrest defendant and should have issued summons where police saw him commit traffic infractions and took his license and registration, then directed him to follow them to 40th Precinct to be issued summonses].)[14]

The commission of traffic infractions coupled with flight from the police has been held to justify a full-blown arrest. (*People v Henry*, 181 Misc 2d 689 [Sup Ct, Queens County 1999] [motion

**13.** Such arrests are permitted when a driver cannot produce a driver's license (*People v Copeland*, 39 NY2d 986 [1976]), but there is no evidence that Officer O'Dwyer asked defendant for his license.

**14.** A full-blown arrest for a minor criminal offense does not violate the US Constitution, however, even when the violation is punishable only by a fine. (*Atwater v Lago Vista*, 532 US 318, 354 [2001] [officer authorized to make custodial arrest for driving without seat belt].)

to suppress physical evidence denied; because police had to chase suspect as he fled at speeds of 30 to 70 miles per hour for three to five minutes after they attempted to stop his vehicle for driving without headlights, and then chased him on foot, officers were not required to issue summons and release defendant].) Contrary to his claim, the evidence at the hearing clearly established that defendant, who was the only other driver on Rosedale Avenue, deliberately failed to stop despite police lights and sirens, although, contrary to the People's argument, there was no evidence at the hearing that he also attempted to flee on foot after his car was stopped.[15] Based on the foregoing analysis, the court holds that the police could lawfully arrest defendant under these circumstances, rather than issuing a summons.

Yet, even if the arrest for the series of traffic infractions was lawful under the facts here, must the photo of defendant taken later that same day be suppressed as a "fruit" of the arrest? (*See People v Marsh*, 20 NY2d at 102 [recognizing that the Legislature never intended that those who commit traffic infractions or fail to appear in court after receiving a traffic summons be treated "as a common criminal to be booked, photographed, fingerprinted and jailed"].) For the reasons that follow, the court holds that the photo used in the photo array need not be suppressed.

The record establishes that after defendant was arrested, he was transported by Officer O'Dwyer to the 43rd Precinct, where he was brought to the front desk, a pedigree sheet was filled out and he was placed in a holding cell (H 61). Thereafter, Officer O'Dwyer learned that both Charles Williamson and Inez Goodwin were at the precinct and spoke with them. Mr. Williamson informed Officer O'Dwyer that he and Ms. Goodwin were on their way to work when defendant drove past them in his car and brandished a knife at Mr. Williamson (H 65-66). Mr. Williamson decided to drive to the precinct to avoid a confrontation with defendant and, while en route there defendant hit Mr. Williamson's car with his car (H 24-25). This information was entirely unrelated to defendant's various traffic infractions. Moreover, Officer O'Dwyer had seen front end damage to defendant's car when he stopped it (H 19). Officer O'Dwyer filled out a "61 complaining [*sic*] report" when he interviewed Mr.

---

**15.** Because defendant did not exceed the speed limit by 35 miles per hour, however, he did not provide Officer O'Dwyer with probable cause to arrest him for the crime of unlawfully fleeing a police officer in a motor vehicle.

Williamson and Ms. Goodwin (H 63).[16] The information provided by these identified citizens, which was partially corroborated by his own observations, gave Officer O'Dwyer probable cause to arrest defendant for menacing (*People v Hicks*, 38 NY2d 90, 94 [1975] [holding that sworn statements of private citizens "may . . . and should" be relied upon by the police as a basis to establish probable cause]), the very charge reflected on the arrest photo taken later at Central Booking, and shown in PX 5.[17] Accordingly, the creation and use of defendant's photograph is not the suppressible fruit of his arrest for a series of traffic violations, as the photo was fully attenuated from the initial arrest by the intervening probable cause. (*People v Davis*, 308 AD2d 343, 344 [1st Dept 2003] [affirming trial court's denial of motion to suppress lineup identification as the fruit of an illegal arrest; lineup was fully attenuated from defendant's arrest and detention where "the information . . . subsequently gathered linking defendant to the robbery, which fully justified the lineup, was entirely unrelated to (defendant's) arrest and detention"], *lv denied* 1 NY3d 570 [2003]; *People v Coste*, 272 AD2d 205, 206 [1st Dept 2000] [affirming trial court's denial of motion to suppress physical evidence; despite initial discovery of gold chain during unlawful search, information police subsequently learned from complaining witness, that defendant had stolen his chain, was "untainted information gained from that independent source" and thus the exclusionary rule did not apply], *lv denied* 95 NY2d 933 [2000]; *People v Brown*, 215 AD2d 333 [1st Dept 1995] [reversing conviction and remanding for further proceedings; police did not have probable cause to arrest defendant, so physical evidence recovered immediately after he was stopped by police was inadmissible; but lineup identification was admissible, because sufficiently attenuated from initial detention, where less than 10 minutes after defendant was stopped, officers received a further description which provided them with probable cause], *appeal withdrawn* 86 NY2d 791 [1995]; *see also People v Kelly*, 79 Misc 2d 534, 536 [App Term, 1st Dept 1974] [affirming trial court's determination that police had probable cause to arrest defendant for traffic infraction where defendant

**16.** The New York City Police Department complaint report is commonly known as Form UF-61 (*People v Selassie*, 140 Misc 2d 616, 617 [Sup Ct, Bronx County 1988]).

**17.** Detective Swindell testified that the photo of defendant that was put in the photo array was taken at Central Booking, which he knew because photographs taken earlier following a defendant's arrest are not saved to the photo manager system, as PX 5 had been (H 232-235).

fled in response to request for license and registration; reversing suppression of drugs recovered at precinct after defendant's arrest, because when defendant provided officer with license with different "type" from that normally used by the Department of Motor Vehicles, officer had probable cause to arrest him for possession of forged instrument].)

For these reasons, this court holds that the police were justified in creating a photo array and showing it to Mr. Williamson.

While the photo array need not be suppressed, however, the court is constrained to hold that, under *People v Marsh* (20 NY2d 98 [1967]), the accidental precinct showup must be suppressed. This viewing of defendant, as he was being taken to a holding cell inside the 43rd Precinct, and before the police had probable cause to arrest him for menacing, was clearly the "fruit" of his arrest for the traffic infractions.

### The Photo Arrays

Even though the accidental precinct showup must be suppressed on other grounds, the court must also determine whether it was unduly suggestive and therefore whether it tainted the subsequent identification from the photo array. For the reasons that follow, the court holds that it did not.

The fact that Mr. Williamson observed defendant, who was in handcuffs, being brought into the 43rd Precinct by police officers does not render the identification unduly suggestive, where, as here, the identification was clearly spontaneous, was not police-arranged, and was untainted by any "untoward police conduct." (*See People v Gonzalez*, 46 NY2d 1011, 1012 [1979] [identification at accidental showup was spontaneous and untainted by any "untoward police misconduct"]; *see also People v Bellinger*, 253 AD2d 701 [1st Dept 1998] [suppression motion properly denied, where accidental station house viewing of defendant not a suggestive, police-arranged identification procedure], *lv denied* 92 NY2d 1028 [1998]; *People v Buie*, 226 AD2d 215 [1st Dept 1996] [brief, accidental showup at precinct, where defendant and several others were being escorted to lineup area by at least three plainclothes detectives, not product of police misconduct or so suggestive as to taint lineup], *lv denied* 88 NY2d 934 [1996]; *People v Nimmons*, 177 AD2d 444, 445 [1st Dept 1991] [accidental viewing at precinct which led to spontaneous identification of defendant did not warrant suppression as unduly suggestive police-arranged identification procedure; no substantial likelihood of misidentification], *lv denied* 79 NY2d 922 [1992].)

Even as a question of federal due process, the fact that a defendant was handcuffed and surrounded by police officers when identified by a witness "does not, without more, constitute unnecessarily suggestive circumstances." (*Battee v Phillips*, — F Supp 2d —, —, 2010 WL 2026443, *12, 2010 US Dist LEXIS 50569, *36 [ED NY 2010] [denying habeas petition].) But, "The federal standard does not ask whether the suggestive procedure was orchestrated by the police." (*Richardson v Superintendent of Mid-Orange Correctional Facility*, 639 F Supp 2d 266, 286 [ED NY 2009] [collecting cases].) Rather, when deciding claims of suggestive identification in the habeas context, federal courts focus on "the effects, rather than the causes, of suggestive encounters." (*Id*. at 287 n 8.) Accordingly, the fact that the "showup" here may have occurred by happenstance rather than premeditated police design does not change the due process analysis. (*See e.g. Allen v New York*, 2010 WL 811715, *4, 2010 US Dist LEXIS 17814 *11-13 [WD NY 2010] [collecting cases] [showup not unduly suggestive where witness was brought to police station to give a statement, inadvertently encountered petitioner in a vestibule, and volunteered to officers that she recognized petitioner as the perpetrator]; *Battee*, — F Supp 2d at —, 2010 WL 2026443, *12 n 3, 2010 US Dist LEXIS 50569, *37 n 3; *see also Raheem v Kelly*, 257 F3d 122, 137 [2d Cir 2001] [fact that suggestiveness of lineup may have been unintentional was immaterial, because "(t)he purpose of excluding identifications that result from suggestive police procedures is not deterrence but rather the reduction of the likelihood of misidentification"], *cert denied sub nom. Donnelly v Raheem*, 534 US 1118 [2002].)

Thus, relying on *Richardson*, defendant argues that the court must analyze the precinct showup to determine whether it created a substantial likelihood of irreparable misidentification, despite the fact that it may have been accidental and not police-arranged. Defendant argues that, under the five-factor test of *Neil v Biggers* (409 US 188 [1972]), the accidental precinct showup was unduly suggestive and tainted Mr. Williamson's ability to make a reliable identification from the photo array. This court disagrees.

The five factors that must be considered

"in balancing the suggestiveness of the procedures against evidence of reliability [are]: 'the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the ac-

curacy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.' " (*Richardson v Superintendent*, 639 F Supp 2d at 286, quoting *Neil v Biggers*, 409 US at 199-200.)

The *Richardson* court also observed that "[a]gainst these factors is to be weighed the corrupting effect of the suggestive identification itself." (*Id.*, quoting *Manson v Brathwaite*, 432 US 98, 114 [1977].) As the *Richardson* court observed more than once, "[r]eliability is the linchpin of admissibility." (*Id.* at 284, quoting *Manson* at 114; 639 F3d at 286, citing *United States v Concepcion*, 983 F2d 369, 377-378 [2d Cir 1992].)

Conducting this analysis here, the court holds that the accidental precinct showup did not taint the identification from the photo array later that evening. On August 24th, the day before, Mr. Williamson had seen defendant speaking with Ms. Goodwin for about five minutes from less than 10 feet away, then approached him and had a face-to-face conversation with him that lasted 10 to 15 minutes. Mr. Williamson's degree of attention during that encounter was high, because he was concerned about Ms. Goodwin, who looked uncomfortable to have encountered defendant at her workplace, and who had told Mr. Williamson that she had had problems with "Delroy" in the past (H 151). He was also focused on this encounter because, "I was like, who is he [defendant], right because I'm in a relationship with her, so I'm trying to figure out who he was" (H 147). Then on August 25th, Mr. Williamson saw defendant again as he drove past his car, brandished a knife, and then crashed into his vehicle. After this encounter, Mr. Williamson immediately went to the precinct to file a police report. Although the record does not contain any description that Mr. Williamson gave of defendant, defendant concedes that there is also no evidence that his clothing was a significant factor in that description. (*See People v Stanley*, 68 AD3d 422 [1st Dept 2009] [motion to suppress identification testimony properly denied; witness told police only after he viewed otherwise fair lineup that defendant was wearing clothing taken during crime; given witness's knowledge of defendant's nickname and identification from photo array two days earlier, lineup identification sufficiently reliable].) There is no evidence that Mr. Williamson hesitated before he

selected defendant's photo from the array (H 167, 180-82),[18] and the better part of 12 hours passed between the showup at the precinct and the photo array at the complaint room.[19]

" 'None of these factors standing alone is dispositive of the existence of independent reliability; instead, reliability is assessed "in light of the totality of the circumstances." ' " (*Richardson*, 639 F Supp 2d at 293-294, quoting *Brisco v Ercole*, 565 F3d 80, 89 [2d Cir 2009], *cert denied* 558 US —, 130 S Ct 739 [2009]; *see also Raheem v Kelly*, 257 F3d at 135.) Under the totality of the circumstances here, Mr. Williamson's identification of defendant from the photo array on August 25th was reliable, despite any suggestiveness that might have resulted from his seeing defendant under arrest at the precinct. Mr. Williamson had had a good opportunity to see defendant the day before and saw him again at the time of the car crash (H 152). While there is no evidence about his degree of attention during the second encounter, his degree of attention was high during the first encounter. The time between these two encounters and the identification from the photo array was relatively short, and the witness was very certain about the identification.

Nor is suppression of an in-court identification mandated because Mr. Williamson was "pretty sure" that someone told him he had picked "the correct person" (H 171) from the photo array. It is improper for the police to make such a remark to a witness, but this remark cannot have tainted Mr. Williamson's subsequent identification of defendant 16 months later, or his ability to make a reliable in-court identification at trial. (*People v Hamilton*, 271 AD2d 618, 619 [2d Dept 2000] [although remark by police officer after complainant selected defendant's photo from array may have been inappropriate, it did not taint identification from nonsuggestive lineup six weeks later], *lv*

---

**18.** As Mr. Williamson explained on redirect examination, the approximate time that elapsed from the time he walked into a room with Detective Harvey, sat down, looked at the photo array, identified defendant's photo and wrote his statement on it, until Detective Harvey then left the room, was five minutes (H 182). Indeed, he testified that "I looked at the pictures and I immediately signed my name to the person who I, you know, remembered having the altercation with" (H 180).

**19.** At approximately 5:30 A.M. on August 25, 2008, defendant allegedly crashed his car into Mr. Williamson's car (H 15). At approximately 5:32 A.M., Officer O'Dwyer radioed that he was following defendant's car (H 55). The evidence at the hearing did not include the approximate time of the accidental showup, but the identification from the photo array took place at approximately 6:30 P.M., or about 13 hours after the alleged crime (H 84, 89).

*denied* 95 NY2d 797 [2000]; *People v Baptiste*, 201 AD2d 659, 660 [2d Dept 1994] [while it was improper for police officer to tell witness that she had selected incorrect photo from array, it did not taint subsequent identification from nonsuggestive lineup]; *People v Harley*, 174 AD2d 576, 577 [2d Dept 1991] ["The mere fact that a witness is told that his lineup identification is correct does not mandate the suppression of any subsequent in-court identification (*cf. People v Wilson*, 111 AD2d 940)"], *lv denied* 78 NY2d 1076 [1991].)

Moreover, because the identification from the photo array was not the product of any undue suggestiveness, the People may introduce evidence of it if defendant opens the door. (*See People v Mahone*, 206 AD2d 263 [1st Dept 1994] [trial court properly admitted testimony regarding victim's lineup and photo array identifications that had been suppressed to prevent defendant from creating misleading impression that victim had been unable to identify defendant prior to trial], *lv denied* 84 NY2d 869 [1994]; *see also People v Mercado*, 258 AD2d 289, 289 [1st Dept 1999] [trial court properly permitted People to introduce photograph of defendant that had been used in photo array where defendant "opened the door" to its admission], *lv denied* 93 NY2d 927 [1999]; *People v Francis*, 123 AD2d 714, 714 [2d Dept 1986] ["although as a general rule, evidence of a pretrial photographic identification of a defendant is not permitted, exceptions to the general rule may be made and evidence of pretrial photographic identifications may be admitted ' "to answer an attack of 'recent fabrication' or because the defendant opened the door to this line of questioning on cross-examination" ' "] (citation omitted)]; *People v Carter*, 52 AD2d 829, 830 [1st Dept 1976] ["Unless justified to answer an attack of 'recent fabrication' or because the defendant opened the door to this line of questioning on cross-examination, testimony of prior photographic identification is inadmissible"].)

Approximately 16 months after the showup and photo identification, and over five months before the instant suppression hearing, Mr. Williamson identified defendant again without any hesitation from photo arrays during trial preparation. The People were permitted, if not obligated, to prepare with their witnesses for the instant hearings and upcoming trial, and it was permissible to use exhibits while doing so. (*People v Herner*, 85 NY2d 877, 879 [1995] [conviction affirmed; prosecutor's showing of photograph of lineup to victim the night before and the morning of her trial testimony was "clearly preparation for

trial," and was not an identification procedure within the meaning of CPL 710.30; defendant was given opportunity to question victim at hearing outside presence of the jury to explore whether manner in which photo array was shown to her was suggestive]; *see also People v Williams*, 8 AD3d 74 [1st Dept 2004] [prosecutor properly displayed photographs of defendant and other suspects to witness in preparation for his grand jury testimony to review their respective roles in the crime], *lv denied* 3 NY3d 713 [2004]; *People v Hopkins*, 284 AD2d 223 [1st Dept 2001] [witness's viewing of photographs of defendant and codefendants prior to trial to review their roles in the crime constituted proper trial preparation], *lv denied* 96 NY2d 902 [2001]; *People v Morales*, 248 AD2d 173 [1st Dept 1998] ["The officers' viewing of defendant's arrest photograph several days prior to trial was proper preparation for trial and not an identification procedure, and did not taint the subsequent in-court identifications, given that defendant had already been identified by them at the time of arrest" (citation omitted)], *lv denied* 92 NY2d 857 [1998].) Although defendant argues that this "identification procedure" was unnecessary, he does not accuse the prosecutor of any misconduct in relation to it (A 194-195).

Moreover, under the totality of the circumstances, this court holds that these identifications were also reliable. (*See People v Leibert*, 71 AD3d 513 [1st Dept 2010] [even if accidental single-photo showup was unduly suggestive, identification was sufficiently reliable, where witness had previously identified defendant from surveillance video and also identified him at lineup six weeks later, which was sufficient time to attenuate any taint from the viewing of the photo]; *cf. Raheem v Kelly*, 257 F3d at 136, 140 [witnesses' identifications unreliable, where witnesses received poor ratings on *Neil v Biggers* factors, and totality of circumstances included their inability to describe any features of shooter's face, their misidentification of someone else, who had stood closest to them, as gunman, emphasis of both witnesses on black leather coat worn by shooter, and their repeated references to black leather coat as influential in their selection of petitioner from lineup in which only petitioner was wearing black leather coat]; *Richardson v Superintendent*, 639 F Supp 2d at 287-288, 291-292, 294-295 [identification unreliable where, inter alia, witness saw two suggestive precinct showups in which petitioner was surrounded by two taller suspects; witness described petitioner as young and short only after these two showups; trial court reopened *Wade* hearing during trial after

learning about initial precinct showup but refused to allow defendant to call police officers who were present to testify; and witness inaccurately identified someone else as shooter].)

For all of these reasons, this court holds that there is no substantial likelihood of an irreparable misidentification by Mr. Williamson. Accordingly, there is no need to conduct an independent source hearing.

## Conclusion

Accordingly, defendant's motion to suppress the accidental precinct showup is granted, but his motion to suppress the photo array and an in-court identification is denied.