OPINION OF THE COURT
Miriam R. Best, J.
For the reasons that follow, defendant’s motion to suppress physical evidence is denied. The People’s motion to close the courtroom during the testimony of the undercover officer is granted. Defendant’s motion to allow an unlimited number of Legal Aid Society lawyers to be present in the courtroom during the undercover officer’s testimony is denied.
This court held a MapplDunaway /Hinton hearing on February 9, 2012. Detective Jason Duval testified on the suppression issues and Undercover Officer 163 (hereinafter, UC 163) testi *553 fled relative to the People’s application to close the courtroom for a portion of the trial. The court found these witnesses credible and credits their testimony.
Findings of Fact
On July 20, 2011, at approximately 2:00 a.m., Detective Du-val, a 10-year veteran of the NYPD, was assigned as the arresting officer for an investigation into prostitution conducted by the Vice Enforcement Division in the vicinity of a Howard Johnson Express hotel at 1922 Boston Road, Bronx County, a location where Duval had made prostitution-related arrests in the past (H 10, 12).[1] The Vice Enforcement Division investigates and makes arrests for after-hours clubs, unlicensed clubs, prostitution, promoting prostitution, sex trafficking and the sale of narcotics inside clubs (H 10). While Duval, who was in plain clothes, waited in an unmarked police car about 20 yards away, he watched an undercover police officer speaking with defendant (H 12-14).[2] The area was not very dark and there were streetlights and buildings in the area (H 39). Within seconds of seeing a positive agreement sign from the undercover, Duval arrested defendant and the undercover confirmed to Duval that he had arrested the right person (H 41).[3] Duval recovered a purse from defendant’s person, inside of which were 24 condoms, one package of lubricant and two cellular telephones (H 14-16).
UC 163 has been a member of the NYPD for 11 years and an undercover officer for eight years (H 48-49). UC 163 is assigned to the vice club team as the head undercover and does all of the team’s prostitution cases (H 49, 50). The vice club team deals with narcotics arrests, case work inside clubs in Manhattan, and human trafficking and underage prostitution cases throughout New York City (id.). UC 163 works in all of the boroughs, *554 usually on the midnight tour, has open cases in most of the boroughs, is involved in undercover operations “[a]ll over the city,” has cases in which he was the undercover officer pending in the Bronx Hall of Justice, and has targets of his investigations still at large (H 49-51, 64) ,[4]
[5]UC 163 works “pretty evenly” in Brooklyn, Queens, the Bronx and Manhattan, and has the fewest cases in Staten Island (H 54, 55). As for the Bronx specifically, UC 163 works in “a multitude of precincts” and has done a substantial amount of undercover work in the precinct in which the Bronx Hall of Justice is located (H 55). UC 163 expects to work as an undercover officer for the duration of his career (H 49).
UC 163 described his work in prostitution cases in detail:
“I step out. I make phone calls. I help cultivate cases as far as prostitution is concerned. I am on the sets. I’m the one who is in conversation with the prostitutes. I’m the one who gets the positives or negatives from the subjects. And I’m the one who informs the field team if it’s an arrest situation or not.” (H 50.)[5]
UC 163 also does buy and busts and long-term case operations throughout the city in which he purchases. drugs, and also makes gun buys (H 51-52, 60).
UC 163 has received safety threats regarding his status as an undercover officer: “Throughout the eight years I’ve been undercover, I’ve been told numerous times that if I was found out I was a cop, that I would be killed. I have been in different situations in the eight years I’ve been an undercover similar to that.” (H 51.) In a prostitution investigation, a pimp “who was trusting me to go off with one of his girls . . . said that if he found out I was a cop or snitch, he was going to come back and kill me” (H 66). To the best of his knowledge, UC 163 has never been threatened by a Legal Aid attorney, a Bronx Defenders attorney, or any member of the Bronx Bar Association (H 57-58, 65), but he would not know if anyone who had threatened him were an attorney with those organizations, or an employee of the District Attorney’s Office or a judge, for that matter (H 63, *555 65). As UC 163 explained, “[s]ometimes we arrest people that least expect to be out soliciting prostitution or buying drugs, so anybody could be out there” (H 61).
In addition, UC 163 takes precautions when entering a courthouse to minimize interaction with the public, including wearing plain clothes but no police shield, driving to the courthouse in an unmarked car, entering through a different entrance, following different procedures from uniformed officers when entering and leaving the courthouse, and staying alone in a separate room while waiting to be called as a witness (H 52-53).[6] Indeed, the number “163” is an undercover number rather than a shield number; UC 163 does not use a shield number because a shield number can be tracked to reveal an undercover’s identity (H 53). UC 163 has testified at two trials, in both of which the courtrooms were closed (H 67-68).
In UC 163’s opinion, having a large number of spectators, for example, 50, in the courtroom during his testimony could jeopardize investigations and threaten his safety. UC 163 explained that
“[i]f I’m out in the field and one of the 50 people recognize me, that could put me at liberty [sic] in a new — a numerous amount of ways. It could potentially blow my cover for the case thus putting me in harm’s way with any subjects that I’m dealing with.” (H 63-64.)
Such a large number of spectators would in itself be jeopardizing regardless of the composition of the spectator pool (H 64-65).[7] The sheer number of spectators would create potential problems because,
“At any time where ever I am in the city, there’s a possibility of bumping into someone who’s seen me as a police officer I would be obviously taking on the stand and testifying. Whether that person can’t place where they know me from and they think I’m a cop and I’m in conversation with somebody else *556 and they say hey, do I know you from the police department or something? Just that statement alone could have a subject I’m dealing with run back to whoever, if not themselves, and definitely put harm in my safety at any time. That’s why I prefer the least amount of people to ever be in a courtroom when I am testifying.
“The more people that — especially in an open courtroom it’s just that more people to see my face and possibly wonder who I am if they ever run into me thus putting me in jeopardy because it may not be right from that person but it could be from the person that I’m with at the time.
“A lot of these cases I have to befriend people for long terms and, you know, it’s not one, two, three on a street. It’s, you know, face time with these people whether it’s out to eat or this and that, you know, someone recognizes me and potentially blows my cover, I may be buying a gun from this person and that’s going to cause me jeopardy possibly in the long run.” (H 66-67.)
Conclusions of Law
I. Police Had Probable Cause to Arrest Defendant
When a defendant moves to suppress evidence seized at the time of her arrest, the People have the burden of going forward, in the first instance, with credible evidence tending to show the legality of the police conduct. (People v Berrios, 28 NY2d 361, 367 [1971].) Once the prosecution has met this burden, defendant has the ultimate burden of proving by a preponderance of the evidence that the officers acted illegally. (Id.; People v Burgos, 81 AD3d 558 [1st Dept 2011]; People v Bogan, 15 Misc 3d 1109[A], 2007 NY Slip Op 50560[U], *2 [Sup Ct, Bronx County 2007, Dawson, J.]; see also People v Bulgin, 29 Misc 3d 286, 294 [Sup Ct, Bronx County 2010, Best, J.].)
It is well settled that, under the fellow-officer rule, a police officer can make a lawful arrest, even without personal knowledge sufficient to establish probable cause, if the officer is acting upon a communication with a fellow officer who has information sufficient to constitute probable cause for the arrest. In the context of a “buy and bust” operation, probable cause may be established at a suppression hearing solely through the testimony of a police officer who acted upon communications from an officer who participated in or witnessed the criminal *557 conduct. (People v Ketcham, 93 NY2d 416, 419-420 [1999].) That is precisely the case here. Detective Duval watched the undercover officer engage in conversation with defendant, who appeared following an arrangement the undercover made by telephone, from approximately 20 yards away in a well-lighted area where Duval had made prostitution-related arrests before (H 39). He saw the positive agreement sign and the undercover immediately confirmed that defendant was the person to be arrested (H 41). Thus, the People have met their burden of going forward on the Mapp/Dunaway issues and established the legality of the police conduct. (See People v Ketcham, 93 NY2d at 422 [affirming lower court’s denial of motion to suppress; evidence that arresting officer received “positive buy” transmission, coupled with a location and description of defendant, was sufficient to establish probable cause to arrest]; People v Stokes, 271 AD2d 237, 237 [1st Dept 2000] [affirming hearing court’s denial of suppression motion, holding that apprehension team had probable cause to arrest based upon “ghost” officer’s observation of defendant in contact with undercover police officer, followed by undercover’s prearranged “positive buy” signal], lv denied 95 NY2d 858 [2000].)
Moreover, defendant has not established that the police acted unlawfully. Therefore, because the police had probable cause to arrest defendant, the motion to suppress the physical evidence recovered from her is denied. (People v Rodriguez, 199 AD2d 181, 181 [1st Dept 1993] [“The People’s burden of establishing probable cause having been satisfied, the suppression court properly denied suppression of the evidence seized after defendant’s arrest”].)
II. The Courtroom Should be Closed during the Testimony of UC 163
“A criminal defendant’s right to a public trial, though fundamental, is not absolute. Rather, trial courts possess ‘inherent discretionary power’ to exclude members of the public from the courtroom. There remains, however, a presumption of openness. Consequently, the right to an open trial may yield to other rights or interests in rare circumstances only, and ‘the balance of interests must be struck with special care.’ ” (People v Ramos, 90 NY2d 490, 497 [1997] [citations omitted].)
Moreover, it is well established that “ ‘[w]hen the procedure requested impacts on a defendant’s right to a public trial, noth *558 ing less than an overriding interest can satisfy constitutional scrutiny’ ” (People v Sanabria, 301 AD2d 307, 311 [1st Dept 2002] [citation omitted]).
The People moved to close the courtroom during the testimony of UC 163, arguing that “the undercover officer, who has over 10 years experience, is going to face a serious threat to his safety and longevity of his career if the doors remain open during his testimony” (H 47). This request is for a limited closure: the People have consented to allow defendant’s family members to observe UC 163’s trial testimony (H 75) and have not requested that the record of UC 163’s trial testimony be sealed (H 75).
A. The Record Supports Closure for UC 163’s Safety and to Protect Ongoing Investigations
In determining whether closure is appropriate, the United States Supreme Court has set forth a four-prong test. The party seeking closure “must advance an overriding interest that is likely to be prejudiced, the closure must be no broader than necessary to protect that interest, the trial court must consider reasonable alternatives to closing the proceeding, and [the trial court] must make findings adequate to support closure.” (Waller v Georgia, 467 US 39, 48 [1984].)
UC 163 has been an undercover police officer for eight years and is active in prostitution and narcotics undercover operations throughout the “entire city” (H 51). On his team, UC 163 is the undercover “who does all the prostitution cases” (H 50), makes the telephone calls to arrange meetings, and personally engages in conversation with suspected prostitutes. UC 163 also purchases drugs and guns as an undercover and participates in long-term investigations where he has to “befriend people for long terms,” and spend “face time” with the targets (H 67). UC 163 has five other cases pending in the Bronx Hall of Justice where he was the undercover officer, other nonprostitution criminal investigations pending in Manhattan and approximately five targets at large. UC 163 conducts approximately 25% of his undercover work in Bronx County in numerous precincts and has conducted a substantial amount of undercover work in the precinct where the Bronx Hall of Justice is located. Indeed, UC 163 testified that there was a very good possibility that he could work in the area of the courthouse when he went to work after testifying at the Hinton hearing. UC 163’s life has been threatened numerous times, once in connection with a prostitution case. Finally, in order to protect his identity on the day of his testimony, UC 163 dressed in plain clothes, drove an *559 unmarked car to the courthouse, entered through a different entrance, did not mingle with the general population, checked in through a sergeant, entered and exited the courtroom through a back hallway rather than the front door and was kept in a separate, secure location before testifying.
In light of the foregoing evidence, the People plainly established an overriding interest in protecting UC 163’s identity and safety that warrants a limited closure of the courtroom during the UC’s testimony. (See People v Crayton, 80 AD3d 478 [1st Dept 2011] [evidence at Hinton hearing established an overriding interest that warranted limited closure of courtroom; officer’s testimony that he continued undercover work in the specific area of defendant’s alleged sales, had open investigations, cases involving lost subjects, other cases pending in the courthouse, had often been threatened and took precautions to protect his identify demonstrated that his safety and effectiveness would be jeopardized by testifying in an open courtroom], lv denied 16 NY3d 857 [2011]; People v Mickens, 82 AD3d 430 [1st Dept 2011] [evidence at Hinton hearing established an overriding interest that warranted limited closure of courtroom; officer’s testimony that he continued to work in vicinity of area of charged crimes, had open investigations, had cases pending in the courthouse, had been threatened in other undercover investigations and took precautions to protect his identity demonstrated that his safety and effectiveness would be jeopardized by testifying in an open courtroom]; People v Manning, 78 AD3d 585 [1st Dept 2010] [evidence at Hinton hearing established an overriding interest that warranted a limited closure of the courtroom; officer’s testimony that he continued undercover work in the specific area of defendant’s alleged sale of a controlled substance and had open investigations, unidentified subjects, lost subjects and other cases pending in the courthouse demonstrated that his safety and effectiveness would be jeopardized by testifying in an open courtroom].) Indeed, defense counsel conceded that UC 163 had a “legitimate fear of unknown strangers” and that the courtroom should be closed to the general public (H 83-84).
B. Defense Counsel’s Bald Claim That All Bronx Legal Aid Lawyers Should be Exempt from the Court’s Limited Closure Order Does Not Shift the Burden Back to the People to Demonstrate That All Bronx Legal Aid Lawyers Should be Excluded
Despite this concession, however, defense counsel claims that each and every attorney at the Bronx Legal Aid Society should *560 be permitted to attend the trial during UC 163’s testimony simply because they are “officers of the court.” Defense counsel never made a specific request for particular attorneys to attend during UC 163’s testimony. Instead, he named a laundry list of people who might want to attend.[8] At the close of the Hinton hearing, defense counsel argued that UC 163 could not articulate a reasonable fear of Legal Aid attorneys in general and thus, they must be permitted to attend during his testimony.
Defendant’s argument misses the mark. The Court of Appeals has held that “once a defendant seeks the inclusion of a particular individual, the party seeking exclusion is again burdened with proving that the exclusion of that individual is necessary to protect the witness.” (People v Hines, 225 AD2d 706, 707 [2d Dept 1996] [emphasis supplied and citations omitted].) However, defendant’s blanket request for an exemption to the closure of the courtroom during UC 163’s testimony for every Legal Aid attorney is simply insufficient to shift the burden back to the People to establish that the exclusion of every Bronx Legal Aid attorney is necessary to protect UC 163. (See People v Smith, 266 AD2d 62, 62 [1st Dept 1999] [defense counsel’s failure to specify whom he wished to be present dur *561 ing the UC’s testimony “deprived the court of the opportunity to assess the potential danger that might be posed to the officer’s safety”], lv denied 95 NY2d 838 [2000]; see also People v Dean, 88 AD3d 578, 579 [1st Dept 2011] [“Instead of a complete closure, the court permitted defendant’s family members and other persons specified by defendant to attend, subject to appropriate screening measures”] [emphasis supplied], lv denied 18 NY3d 858 [2011].)
Moreover, defendant’s reliance on People v Hines (225 AD2d 706 [2d Dept 1996]) and People v Mercer (204 AD2d 741 [2d Dept 1994]) in support of his argument that every attorney at the Bronx Legal Aid Society should be exempted from this court’s order closing the courtroom is misplaced. While Hines and Mercer plainly establish that where defense counsel requests the presence of a specific supervisor or colleague during the testimony of an undercover police officer at a closed proceeding, the People must prove that exclusion of that spectator is necessary to protect the undercover officer (People v Bess, 220 AD2d 603 [2d Dept 1995]), they simply do not stand for the proposition that every member of Bronx Legal Aid is exempt from this court’s order closing the courtroom during UC 163’s testimony.[9] Defendant’s reliance on People v Gutierez (209 AD2d 217 [1st Dept 1994], revd 86 NY2d 817 [1995]) is similarly misplaced, because in Gutierez, the Appellate Division, First Department, merely observed that the trial court’s ruling that “any latecoming colleagues . . . would be excluded as an *562 administrative measure to avoid disruption” did not constitute an order excluding defense counsel’s colleagues or supervisors. (209 AD2d at 218.)[10] Indeed, defendant has failed to provide this court with a single case standing for the proposition that all members of the bar are exempt from an order closing a courtroom and this court’s extensive research has not revealed any such case.
Moreover, in stark contrast to Hines, Mercer and Gutierez, in People v Charlton (247 AD2d 628 [1998]), the Second Department specifically rejected defendant’s claim on appeal that the trial court’s order excluding members of the Legal Aid Society from the courtroom during the testimony of the undercover officer was impermissibly broad.[11]
Moreover, by failing to specify those colleagues or supervisors whom defense counsel wants to attend, he has failed to provide the court with enough information to consider reasonable alternatives to closure. (See People v Ramos, 90 NY2d 490, 505 [1997] [trial courts did not breach their duty to consider reasonable alternatives to closing the courtroom, where record was sufficient to establish that any open-court testimony by the *563 undercovers would jeopardize their safety, neither defendant mentioned alternatives he was willing to adopt and “no mention was made of specific individuals the defendants wished to attend”]; People v Martinez, 82 NY2d 436, 444 [1993] [trial court’s failure to consider reasonable alternatives proposed by defendant for the first time on appeal was not error where there had been no unidentified spectators in the courtroom from the time trial started and defendant made no mention of particular friends or family he wished to have in attendance]; People v Pryor, 243 AD2d 656, 656 [2d Dept 1997] [affirming defendant’s conviction after trial, rejecting defendant’s claim that trial court’s complete closure of the courtroom during testimony of one undercover officer was overly broad; “defendant failed to discharge his burden to ‘alert the court to any alternative procedures that allegedly would equally preserve the interest.’ His counsel’s generalized request that ‘any defense attorneys who seek to come in for any reason to observe be permitted to do so’ failed to identify any particular person who wished to attend the proceedings, and no such individual was present in the courtroom at the time the request was made” (citation omitted)], lv denied 91 NY2d 929 [1998].)
Conclusion on the Hinton Hearing
For all of these reasons, defendant’s motion to permit every Bronx Legal Aid attorney to attend the trial during UC 163’s testimony is denied. If defense counsel specifically identifies a supervisor and/or colleague whom he wishes to be present in the courtroom during the UC’s testimony, this court will reconsider the motion to close the courtroom with respect to defense counsel’s supervisor and/or colleague.

. Although Duval conceded on cross-examination that he did not recall anything about the other women he arrested for prostitution on the night of defendant’s arrest (H 21-24), he had an independent recollection of defendant’s arrest (H 23). (Parenthetical references preceded by an “H” refer to the hearing minutes.)

. Duval did not personally hear the transaction between defendant and the undercover, but he knew that the undercover had made a telephone call regarding a back-page ad and had arranged a meeting at which defendant showed up, and Duval also knew that the undercover engaged in a prostitution-related conversation in which he agreed to pay defendant $20 for sex. (H 14, 18.)

. Duval maintained visual contact with the undercover during the entire time that the undercover was in position at the location (H 14).

. At the time of the hearing, the number of targets of UC 163’s prostitution investigations still at large was under five, all of them females (H 51, 58), but he had other pending investigations involving other crimes in Manhattan (H 60) and some of the open cases in other boroughs have male subjects (H 62).

. A “positive” means “that I did get an agreement with a prostitute, therefore, necessitating an arrest” (H 50).

. Whereas uniformed police officers go to a special room in the courthouse, display identification, physically punch in and out and get a court slip, UC 163 does not do those things, but rather telephones the desk and speaks with a sergeant and gets a number; the sergeant then punches UC 163 in and out (H 52-53). This court observed UC 163 enter and leave through the back hallway and not through the front door when entering the courtroom to testify on the instant hearing (H 69).

. Defense counsel specifically asked about Legal Aid attorneys, “50 district attorneys,” “50 judges,” and “50 rabbis, popes and nuns” (H 64-65).

. Indeed, when this court asked, “is there anybody in particular in mind that you have, Mr. Frau? Who is your supervisor for example?”, counsel replied as follows:
“MR. FRAU: Well, for instance, I don’t have a supervisor. I have technically nine. I have Elizabeth Felber. I have John Needham. I have Eric Scott who’s in complex B who I go to often because basically when I was a young attorney in Manhattan, I worked with Eric all the time because he was a young attorney in Manhattan. I have Peter Jones in Complex B who I go to often because he was my office mate and we’re more or less in the same experience. I have A1 Rivera and Jay Chubinsky which I don’t use often but they could be useful as well. And I have Michael Monaghan who else [sic] is a supervisor of mine in Manhattan 21 years ago. And I have Michael Murray who I’ve known for approximately 12 years. And then I have a big boss which is David Clark and he might want to come in and evaluate if I’m doing my job properly. So those nine off the bat are supervisors of mine.” (H 91.)
Defendant also went on to name Chuck Ippolito, Ed Burns, Robin Frankel, Vanessa Burdick and Carol McGrath as experienced attorneys who “might want to come” and Maya Graham and Alec Pine as younger attorneys who deal more with misdemeanors (H 92). Defense counsel also named Ms. Vanity Muniz as a younger attorney who deals with misdemeanors. Ms. Muniz is Mr. Frau’s cocounsel, has been present throughout the hearing, including the closed testimony at the Hinton hearing, and has not been made part of the motion to close the courtroom. Because she is actually part of defendant’s immediate trial team, she will of course be permitted to observe UC 163’s trial testimony.

. In Mercer, the Appellate Division, Second Department, reversed defendant’s conviction and ordered a new trial where the trial court denied defense counsel’s request that one of her supervisors be permitted to stay, arguing that the presence of a supervising attorney would not jeopardize the safety of the undercover officer. While the trial judge acknowledged that it might be to trial counsel’s “ ‘advantage perhaps to confer’ ” with a supervisor, he nevertheless denied her request because it was the court’s “ ‘practice to exclude everybody.’ ” (204 AD2d at 742.) The Second Department held that the closure of the courtroom to defense counsel’s supervisor was broader than constitutionally permissible, noting that the trial court failed to make findings adequate to justify the closure of the courtroom to the supervising attorneys on the record and failed to indicate that the presence of defense counsel’s supervisors would endanger the undercover officers. (Id. at 743.) In Hines, the Appellate Division, Second Department, reversed defendant’s conviction and ordered a new trial where the trial court denied defense counsel’s request that a Legal Aid attorney who had been observing the trial be allowed to remain in the courtroom during the undercover’s testimony, holding that defendant’s constitutional right to a public trial was violated when the trial court excluded the Legal Aid attorney. (225 AD2d at 706-707.) However, the undercover officer in Hines specifically stated that he was “not bothered” by the attorney remaining in the courtroom. (Id. at 707.)

. In any event, the Court of Appeals subsequently reversed that defendant’s conviction, without addressing the propriety of the trial court’s decision to exclude late coming colleagues, holding that the trial court erred in excluding defendant’s close family members because the undercover officer never claimed to fear the defendant’s wife and children. (86 NY2d at 817.)

. The court obtained the defendant’s appellate brief in People v Charlton (247 AD2d 628 [1998]), and it is attached as exhibit A to this decision. In Charlton, after the court ordered the closure of the courtroom during the testimony of the undercover officer, defense counsel, a staff attorney with the New York Legal Aid Society asked:
“Judge, would that sealing also apply to members of the Legal Aid Society?
“THE COURT: It will apply unless they’re assisting you on this case. If they’re assisting you in the defense of the defendant of course it will not apply and if they’re not assisting you and are here merely as spectators then that apply to us (sic).
“[Defense Counsel]: Would it apply to supervising attorneys?
“THE COURT: Only if they’re here in a capacity assisting the defense and that’s very broad. Purposely lea??s (sic) it like that.
If you’re in a capacity assisting the defense then you may remain.
If you’re not in a capacity but here merely as a spectator then you are not permitted to remain under my sealing order (T. 43-44).” (People v Charlton, brief for defendant-appellant, 1996 WL 34303471 *5-6 [2d Dept, Jan. 12, 1996].)
The Second Department held that “the trial court’s determination that the courtroom would be closed during the testimony of the undercover officer was appropriate and not overbroad.” (247 AD2d at 628 [citations omitted].)